**John Glenn MOODY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 70883.**

Court of Criminal Appeals of Texas, En Banc.

Jan. 15, 1992.

David W. Thedford, Abilene, for appellant.

James Eidson, Dist. Atty., and Kent Sutton, Ross Adair, Sandra Self, Miles Le-Blanc, Marilyn Brandley, Asst. Dist. Attys., Abilene, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

OVERSTREET, Judge.

In February of 1989, appellant was convicted, in the 350th Judicial District Court of Taylor County, Texas, of capital murder pursuant to TEX.PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp.1988).[1] The indictment alleged that the offense occurred on or about the 3rd day of July, 1988. After the jury returned affirmative answers to the special issues submitted pursuant to TEX.CODE CRIM.PROC.ANN. art. 37.071 (Vernon Supp.1989), the trial judge assessed punishment at death by lethal injection. On direct appeal, appellant raises thirteen points of error. Although appellant does not raise any evidence sufficiency claims, a brief recitation of the facts is necessary for a meaningful discussion of the points which he does raise.

### I.

### SUMMARY OF PERTINENT FACTS

The record reflects that the decedent, a 77 year old widow, was discovered by her sister on the evening of July 4, 1988, lying dead between the dining and living rooms in her own house. She was nude with a telephone cord wrapped tightly around her neck. Oral smears taken from the decedent revealed the presence of spermatozoa, indicating some sort of seminal ejaculation into her mouth. Her house was in a state of some disarray. Two rings which were normally worn by the decedent, as well as her purse and wallet, were missing. Early July 5, 1988, when appellant was booked into jail for public intoxication, he had those two rings in his pants pocket. A bloody fingerprint found on a telephone at the scene of the crime was identified as having been made by appellant. Appellant had done yard work for the decedent in the past and canceled checks indicated that she had paid him for cleaning and yard work during April and May of 1988. Testimony revealed that on the evening of July 3, 1988, a vehicle, which resembled appellant's wife's car, which appellant had custody of at that time, was seen by neighbors

---

1. The jury returned a verdict of guilt as to the two paragraphs of the indictment which alleged capital murder by intentionally committing murder while in the course of attempting to commit and committing robbery and while in the course of attempting to commit and committing aggravated sexual assault.

driving slowly through the neighborhood and parked in the decedent's driveway.

## II.

### JURY SELECTION

■ Appellant's points of error numbers three, five, ten, and eleven deal with occurrences during the jury selection process. Point number three alleges that the trial court's comments on the weight of the evidence were so prejudicial that they deprived appellant of a fair and impartial trial. This comment occurred during preliminary remarks that were being made as the special veniremembers were filling out information sheets. The trial court was inquiring if any of the panel members knew the appellant or the decedent. In making this inquiry, the trial court stated that "[t]hat's the lady that was murdered" and "this man is accused of committing her murder." Apparently, appellant's complaint is that assuming that the decedent was murdered was a comment calculated to convey an opinion of the case in violation of TEX.CODE CRIM.PROC.ANN. art. 38.05 (Vernon 1979).[2] Because we conclude that the comment was not in any way reasonably calculated to benefit the State or prejudice appellant we overrule point number three. *Davis v. State*, 651 S.W.2d 787, 790 (Tex.Cr.App.1983).

■ Point number five avers that the trial court abused its discretion by excusing a veniremember on its own motion. Statements by the trial court and sworn testimony by a deputy district clerk indicate that that veniremember was excused because he had an out-of-town vacation scheduled for the next week. While the trial court mentioned that it had made the excuse pursuant to its authority from the Government Code, apparently referring to TEX. GOV'T CODE ANN. § 62.110(a) (Vernon 1988) which allows the court to release veniremembers from jury service upon hearing any reasonable sworn excuse, it is undisputed that that prospective juror did not file a sworn affidavit prior to or at the time he was excused. Though there was discussion of getting the veniremember back to file such an affidavit, and the State refers to such being included within the record, we can find no such instrument.[3]

Though the statement of facts does not include a transcription of the discussions between the trial court and this veniremember nor delineate the precise moment in time when the excusal was made, the above-mentioned comments by the trial court and the deputy district clerk do prove that the excusal was made after the entire special panel had been sworn but before any individual questioning had begun. TEX.CODE CRIM.PROC.ANN. art. 35.03 (Vernon Supp.1989) provides for such an excusal if the trial court deems the excuse sufficient. We hold that the trial court's action in the instant cause was not an abuse of discretion. *Harris v. State*, 784 S.W.2d 5, 19 (Tex.Cr.App.1989), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990). We therefore overrule point of error number five.

■ Point number ten claims error in failing to sustain appellant's challenges for cause to two prospective jurors who each demonstrated a bias against various aspects of the law. He did request additional peremptory strikes after he used those that he had on those two veniremembers and claimed that he was forced to accept two objectionable jurors because of such use. Veniremember Deatherage expressed concern about retaliation directed toward his brother, a local deputy sheriff. Appellant also claimed that his answer to Special Issue Number Two would be automatic after a finding of guilt and that he could not

---

**2.** There was no objection to the comment because there were no attorneys, representing either appellant or the State, present at the time.

**3.** The record does contain the State's motion to supplement the record with such an affidavit and this Court's order granting said motion; however, it would appear that such supplementation was never done.

afford appellant the presumption of innocence in both phases of the trial. The concerns about possible retaliation did not indicate any inability or unwillingness to fairly and impartially follow the law.

The record reflects the following exchange between the attorneys and veniremember Deatherage:

[APPELLANT'S ATTORNEY]: Well, let me ask you this, Mr. Deatherage. Let's assume just for the sake of this discussion that you find an accused guilty of capital murder. Okay? And when you—when you're looking at these questions (Indicating), you believe that, well, there's a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society. You believe that. Okay? Based on the evidence and—and on the law.

[DEATHERAGE]: Yeah.

[APPELLANT'S ATTORNEY]: Okay? So you found him guilty of capital murder and you believe the answer to that question ought to be "yes." Okay? Are you with me?

[DEATHERAGE]: I'm with you, yeah. Yeah.

[APPELLANT'S ATTORNEY]: Okay. And you take a look at this question. (Indicating.) Can you—can you think of a situation, understanding that you found him guilty of capital murder, and understanding that your—your answer to number two would be "yes," can you—can you think of—of a situation where your answer to this question would be "no?"

[DEATHERAGE]: No.

[APPELLANT'S ATTORNEY]: You can't?

[DEATHERAGE]: No, I—I sure couldn't.

[APPELLANT'S ATTORNEY]: Because what's important to you—correct me if I'm wrong—is once you find him guilty, if you think he's a danger in the future, you would answer that one "yes." Right?

[DEATHERAGE]: Yes, sir. In my—in my opinion, yes. Uh-huh.

[APPELLANT'S ATTORNEY]: Your Honor, we challenge this juror for cause.

Further questioning reveals the following:

[APPELLANT'S ATTORNEY]: Even if you thought the murder was not deliberate, you would still answer that question "yes" if you answered number two "yes," wouldn't you?

[DEATHERAGE]: If I answered number two "yes?"

[APPELLANT'S ATTORNEY]: Yes.

[DEATHERAGE]: Yes, sir.

[APPELLANT'S ATTORNEY]: We reurge our challenge for cause, your Honor.

However, upon subsequent questioning from the prosecution, Deatherage admitted that he might be "twisted up" about answering the special issues. That questioning reveals the following:

[PROSECUTOR]: Do you remember how we talked about how the Judge would instruct you that each of these questions were to be considered independently of each other and independently of your verdict? Okay?

[DEATHERAGE]: Yes, ma'am.

[PROSECUTOR]: And that you were supposed to look at each question separately and make sure that you were convinced as to what your answer should be. And if it's "yes," that you're convinced beyond a reasonable doubt that, that is the proper answer. Okay?

[DEATHERAGE]: Yes, ma'am.

[PROSECUTOR]: When someone asks you if you can conceive of a set of circumstances, that—that's a difficult question because—because it is a hard to—to sit back there and to think of a hypothetical. Okay? What I'm asking you is if you could follow the law. Okay? And if you could look at each of these questions

independently of each other and not base your answers to the questions on—on, you know, base your answer to question number one separately from your answer to question number two?

[DEATHERAGE]: Yeah.

[PROSECUTOR]: And based only on the evidence, not on your answer to either question. Would you do that?

[DEATHERAGE]: Yes, ma'am.

[PROSECUTOR]: Okay. And just because, let's say, you thought—If you found the Defendant guilty, you're looking at these two questions here. You found he intentionally murdered [the decedent]. In your mind, you think he's been in trouble a lot before. I really think he would commit criminal acts of violence that would constitute a continuing threat to society. So you're convinced that the answer to this should be "yes." Okay? But at the same time you think the murder was a spur of the moment, just intentional, there was no deliberation, there was no thought process. Fight breaks out in a bar. A man pulls out a gun. He's mad. He kills—kills another man in the bar. Okay? An intentional conduct, not—no deliberation, no thought process went into it. Okay? Could you answer "no" to this question even though you—you thought the answer to—to the second question should be "yes" based upon the evidence?

[DEATHERAGE]: I think so, yes, ma'am.

Further questioning from appellant's attorney reflected:

[APPELLANT'S ATTORNEY]: Or if I lose myself, you just stop me. Let's just assume that after you've already found the accused guilty of capital murder. Okay?

[DEATHERAGE]: Okay.

[APPELLANT'S ATTORNEY]: And you start looking at these questions after you hear evidence and you believe that that answer should be "yes." Okay. You're—you're telling me now that it would require something else for you to answer this question "no?"

[DEATHERAGE]: I only said it would be—the probability would be a personal opinion, as far as I'm concerned, of the evidence presented. Yeah.

[APPELLANT'S ATTORNEY]: You would—you would answer this question based on the evidence?

THE COURT: Which question, [appellant's attorney]?

[APPELLANT'S ATTORNEY]: Number one.

[DEATHERAGE]: Yes, sir. Uh-huh.

[APPELLANT'S ATTORNEY]: I'm holding it in my hand. (Indicating.) This one based on the evidence, (Indicating) and this one based on the evidence?

[DEATHERAGE]: Based on the evidence.

[APPELLANT'S ATTORNEY]: And the answer to one—this one, if you answered this one "yes," you wouldn't automatically answer this one "yes?"

[DEATHERAGE]: No, I don't think so. Not—not—it would—would depend on the circumstances.

[APPELLANT'S ATTORNEY]: It would depend on the evidence?

[DEATHERAGE]: The evidence, yes.

[APPELLANT'S ATTORNEY]: And what you believed the evidence showed?

[DEATHERAGE]: Right. Yeah.

[APPELLANT'S ATTORNEY]: And if we turned them around and you believed that one ought to be "yes." Okay? Did I lose you?

[DEATHERAGE]: Yes. If you turned it around. I understand.

[APPELLANT'S ATTORNEY]: If you turned it around—let's assume that you want to answer that one "yes." You would consider the evidence in answering this question, wouldn't you?

[DEATHERAGE]: Yes, sir.

[APPELLANT'S ATTORNEY]: You would do that?

[DEATHERAGE]: You would have to, yeah.

[APPELLANT'S ATTORNEY]: Okay. What we're—we're driving at is that just because you answer one question "yes," you wouldn't automatically answer the other question "yes," would you?

[DEATHERAGE]: I—I would not unless it was proved to me that it needed to be answered "yes" or "no," yeah.

And finally, Deatherage stated, "I—I—in other words, what you're trying to tell me is if the first one is 'yes,' the other one is 'yes.' And I'm—I can't agree with you there." Additionally Deatherage stated that he understood and could follow the law with respect to the prosecutor's early questioning regarding the fact that each of the special issues "need [sic] to be considered separately" and that "a 'yes' answer to one doesn't automatically mean a 'yes' answer to another; just like a 'no' answer doesn't mean automatically mean a 'no' answer to the other." Clearly, veniremember Deatherage did not indicate that he had any bias or prejudice against properly considering each of the Special Issues separately.

Appellant also claims that Deatherage would not afford him the presumption of innocence in both phases of the trial. The record reflects the following exchange:

[APPELLANT'S ATTORNEY]: All right. You—you told me earlier that, well, you would want to hear from the Defendant. Right?

[DEATHERAGE]: True, un-huh.

[APPELLANT'S ATTORNEY]: Okay. You would want to hear from the Defendant. And my question is if the State puts on some—some evidence in the first part of the trial, the guilt-innocence part, and in your mind it falls just a little bit short of beyond a reasonable doubt. Okay? Would you require the Defendant to put on any evidence to bring it back down? Or would you say, "Well, they don't have any evidence. I'm going to jump over this line and I'm going to return a guilty verdict."

[DEATHERAGE]: Well, I believe you're asking me something I shouldn't answer because I—I am—. In other words, what you're really asking me right now, and—and I feel like that would have to be in the trial itself for anyone to answer that question. The evidence presented on both sides.

[APPELLANT'S ATTORNEY]: On both sides?

[DEATHERAGE]: Uh-huh.

[APPELLANT'S ATTORNEY]: Your Honor, we challenge the juror for cause.

This was followed by further questioning by the State:

[PROSECUTOR]: Mr. Deatherage, you understand—do you remember when we were talking about the presumption of innocence and burden of proof? I don't know if I made it very clear to you. Uh, the burden of proof is always on the State. The Defendant has no burden whatsoever. The Defendant does haven't [sic] to prove anything; doesn't have to take the stand and testify; and does not have to put on any evidence.

[DEATHERAGE]: I see where I got twisted up at, yeah.

[PROSECUTOR]: Also, I think it might be confusing because, uh, we're talking about on this scale here right now, we're at no evidence.

[DEATHERAGE]: Okay.

[PROSECUTOR]: Okay. The State is required to put on evidence that proves to you (Indicating) beyond a reasonable doubt, wherever that is in your own mind. Okay?

[DEATHERAGE]: Okay.

[PROSECUTOR]: That the Defendant is guilty all right. What the Defense attorney seems to be asking is you is [sic] would you require the Defense to put on evidence? Okay. Would you require any evidence—to hear any evidence from the Defendant? Let's say the State—we only put on evidence up to here. (Indicating) We didn't quite con-

vince you beyond a reasonable doubt. We didn't meet our burden. Okay. And let's say the Defense didn't put on any evidence. Could you follow the law and find the Defendant "not guilty?" Because there's no such thing as being a little bit guilty. You would agree with me on on that? Okay?

[DEATHERAGE]: Well, beyond a reasonable doubt, yeah.

[PROSECUTOR]: Okay. It has to be beyond a reasonable doubt.

[DEATHERAGE]: Uh-huh.

[PROSECUTOR]: Okay. And the law says the Defense doesn't have to put on any evidence, doesn't have to prove anything. Do you agree with that?

[DEATHERAGE]: Now, I see what— Yes, I—I do agree with it and, uh—

PROSECUTOR: Okay. Would you require that the Defense put on some sort of evidence or—

[DEATHERAGE]: Well, that's what he asked me.

[PROSECUTOR]: All right.

[DEATHERAGE]: That was the question I answered. I said that I would rather not answer, yeah.

[PROSECUTOR]: Okay.

[DEATHERAGE]: But—

[PROSECUTOR]: You may be getting confused. Let's say the State has proven it to you beyond a reasonable doubt and and [sic] let's say you—you heard evidence from the Defense, pushed it back here to that, put a reasonable doubt in your mind. You know, you're talking about getting to the point of beyond a reasonable doubt with the State's evidence.

[DEATHERAGE]: Uh-huh.

[PROSECUTOR]: And not requiring anything from the Defendant. Okay? Can you do that? Can you follow that law?

[DEATHERAGE]: Yes, ma'am, I think so. And uh, I apologize for getting, uh, cross-ways on this and uh—

[PROSECUTOR]: I just want to make sure that—

[DEATHERAGE]: Beyond a reasonable doubt, I have no problem with. I honestly can arrive at it one way or—or not, you know.

[PROSECUTOR]: And you can hold the State to its burden without hearing anything from the—from the Defense or without requiring anything from the Defense, that they don't have to prove that he's not guilty. Would you agree with me on that?

[DEATHERAGE]: Well, it is the law. Right?

[PROSECUTOR]: That's right. And also not just in the guilt-innocence phase, in the punishment phase too. The State still has the burden of proof to prove to you the answers to those—both of these questions should be "yes" beyond a reasonable doubt. The Defense doesn't have to prove to you that they should be "no."

[DEATHERAGE]: Okay. I understand that, yeah. And, uh—

[PROSECUTOR]: Do you agree with that? Do you have any problems with that?

[DEATHERAGE]: No problems.

[PROSECUTOR]: Okay. And you could follow the law and require the State to prove its case to you beyond a reasonable doubt, but not require the Defendant to prove anything?

[DEATHERAGE]: Yes.

Further questioning indicated that Deatherage was reluctant to answer questions relating to if he "could go out right now" and arrive at a verdict, apparently because he did not want to come to a verdict without seeing or hearing any evidence and did not think that anyone could do so without evidence. At one point, he stated that he "would have no verdict" at that time because appellant was "to have a—a fair trial." In direct response to appellant's attorney's question "[D]o you presume that

[appellant] is innocent right now?", Deatherage stated that he thought so until, or if, he is proven guilty. This entire exchange indicates that Deatherage would properly apply the legal presumption of innocence.

■ In evaluating a prospective juror's responses, we recognize that as we are faced with a cold record, we give deference to the trial court and its ruling. *Felder v. State*, 758 S.W.2d 760, 766 (Tex.Cr.App. 1988). There is sufficient evidence in the record to support the trial court's implied finding that Deatherage was a qualified prospective juror. *Johnson v. State*, 773 S.W.2d 322, 327 (Tex.Cr.App.1989). Therefore, there was no abuse of discretion in overruling that challenge for cause.

■ Appellant's point number ten also complains of the trial court's denial of his challenge for cause of veniremember Adams. He avers that Adams would automatically answer the two special issues "yes" and would require proof of innocence from appellant. Adams also indicated that he equated a sexual offender with being a menace to society. We note that appellant never mentioned the sex offender comment in his challenges to Adams, and even now does not specifically argue how that comment indicates any reason for challenge for cause. Therefore we conclude that such was not a basis for a successful challenge for cause.

The record reflects the following dialogue:

[APPELLANT'S ATTORNEY]: Now, (Indicating) in your questionnaire you said that you believe in the death penalty, and you explained it a little bit and you said you believe that it should be assessed if a person is a proven murderer of innocent people, if it's proven that he's a murderer of innocent people, is that what you said?

[ADAMS]: That's what I said.

[APPELLANT'S ATTORNEY]: Can you explain that a little bit?

[ADAMS]: Well, proven beyond a reasonable doubt that he was a murderer,

and I think they would be a menace to society.

[APPELLANT'S ATTORNEY]: You would think that automatically?

[ADAMS]: Yes, if he was proven a murderer.

[APPELLANT'S ATTORNEY]: All right.

[ADAMS]: I would.

[APPELLANT'S ATTORNEY]: So because you think that automatically would you answer those two questions yes?

[ADAMS]: If he was proven, if it was proven beyond a reasonable doubt.

[APPELLANT'S ATTORNEY]: Well, if what was proven beyond a reasonable doubt?

[ADAMS]: That this person was the murderer.

[APPELLANT'S ATTORNEY]: Yes, sir.

[ADAMS]: Yes, I would answer them yes.

[APPELLANT'S ATTORNEY]: Okay. And that would be all that you would need to find before you answered these questions yes?

[ADAMS]: Yeah, beyond a reasonable doubt.

Further questioning reveals:

[APPELLANT'S ATTORNEY]: So I believe your personal feelings on the death penalty is that it ought to be assessed for a murderer of innocent victims, is that correct?

[ADAMS]: Yes.

[APPELLANT'S ATTORNEY]: Would your feelings on the death penalty cause you to answer either one of these questions yes?

[ADAMS]: No, it wouldn't.

[APPELLANT'S ATTORNEY]: You can put that aside?

[ADAMS]: Yes.

[APPELLANT'S ATTORNEY]: Mr. Adams, awhile ago when you were talk-

ing with [the prosecutor] what did you mean when you said, well, yes, you can answer those questions yes if he's guilty, and he's guilty of murder, and he's a menace to society? Can you explain what you mean by that?

[ADAMS]: Well, I think if it was proven beyond a reasonable doubt that it was deliberate, that he would be a menace to society as far as I am concerned.

[APPELLANT'S ATTORNEY]: So you can't envision any set of circumstances where you would answer question number one yes, that I find this defendant deliberately committed the murder, but answer the second question no, based on the evidence, correct?

[ADAMS]: I—if the first deliberate was yes, I know I would probably—the second one would probably be yes to me too.

[APPELLANT'S ATTORNEY]: You say probably?

[ADAMS]: Well, it would be.

[APPELLANT'S ATTORNEY]: It would be?

[ADAMS]: I think it would.

However, earlier questioning reveals:

[PROSECUTOR]: Now, in asking you that question, what I mean is you wouldn't answer the question solely to get at a result. In other words, let's answer yes so he'll get the death penalty, or let's answer no so he won't, but instead just answer the question based on the evidence, not on the result. Could you do that?

[ADAMS]: I could do that, yes.

and further:

[PROSECUTOR]: And with regard to all the questions, guilt/innocence, question number 1, question number 2, you are telling us that you would answer these questions based on the testimony and the evidence as you saw it?

[ADAMS]: I would do that.

And after appellant's challenge for cause, further questioning reveals:

[PROSECUTOR]: Maybe I didn't do it real clear. Assume that you found the defendant guilty beyond a reasonable doubt.

[ADAMS]: Uh-huh.

[PROSECUTOR]: And the second— and the first question is here, whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result.

[ADAMS]: Oh, I see.

[PROSECUTOR]: And what I am asking: Would you automatically answer that yes?

[ADAMS]: Not automatically on deliberately, you know.

[PROSECUTOR]: Okay.

[ADAMS]: No.

[PROSECUTOR]: So just because you found somebody guilty of capital murder, you wouldn't automatically answer that question yes?

[ADAMS]: No, that's right, not automatically yes on that.

[PROSECUTOR]: That's the question that we need to get at is whether once you found them guilty, would you still keep an open mind and answer these questions?

[ADAMS]: Yes.

[PROSECUTOR]: Based on the evidence?

[ADAMS]: Yes, I see, I would.

*    *    *    *    *    *

[ADAMS]: I could answer them independently, yes.

[PROSECUTOR]: All right. And so you might answer a question "yes," number one yes, but question two no?

[ADAMS]: I could, yes.

[PROSECUTOR]: You might answer both of them no, even though you found him guilty?

[ADAMS]: Yes.

[PROSECUTOR]: And you may answer question one no, but you could answer question two yes, it wasn't deliberate in this case but he is still a continuing threat?

[ADAMS]: Yes, I understand.

[PROSECUTOR]: Would that be a fair statement, Mr. Adams?

[ADAMS]: It would, yes.

Further questioning from both appellant and the State revealed that Mr. Adams would answer "no" to the respective Special Issues based upon the evidence in various scenarios. Thus, it is not clear that he would automatically answer the Special Issues "yes." It is not error on the part of the trial court to deny a challenge for cause to a veniremember who gives equivocal answers on whether or not he could answer a punishment issue in the negative. *Sattiewhite v. State*, 786 S.W.2d 271, 281 (Tex.Cr.App.1989), *cert. denied*, — U.S. ——, 111 S.Ct. 226, 112 L.Ed.2d 181 (1990).

■ Appellant also points out a single instance in which Adams indicated that he would "require to hear from the defense" as proving a bias on the presumption of innocence. However, during that exchange, Adams explicitly stated that he would follow the instructions of the judge even if he did not agree with them. And shortly thereafter in response to State's questioning, he agreed that he would only have to be dissuaded by the defense if the State had presented sufficient evidence of guilt beyond a reasonable doubt. On several other occasions he indicated that he understood and would follow the concepts relating to burden of proof and presumption of innocence. Because there is sufficient evidence in the record to support the trial court's implied finding that Adams was a qualified prospective juror, there was no abuse of discretion in overruling appellant's challenge for cause thereon. *Johnson v. State*, 773 S.W.2d at 327. Based upon our determinations that there was no error in overruling either of appellant's challenges for cause against Deatherage or Adams, we overrule point of error number ten.

■ Point of error number eleven claims that the trial court erred in improperly sustaining the State's challenge for cause to a prospective juror. That veniremember had severe reservations about being involved in a sentence of death because of his prior military armed service in Southeast Asia during the Vietnam conflict. He stated that he "would have a hard time sitting on a panel that would condemn someone...." Specific questioning reflects the following:

[PROSECUTOR]: So are you telling me now that even though you believe in the death penalty, you feel like you could not shoulder the responsibility and you—you could not answer both these questions "yes" knowing that this man right over here would be sent down to Huntsville. He would be put on death row at some time in the future—if both these questions are answered "yes"—he would be taken before dawn into a death chamber. In effect, he would be strapped to a table. He would be injected with a lethal substance, with a poison until he's dead. Knowing that, are you telling me that—that you couldn't answer both of these questions "yes" knowing that?

[VENIREMEMBER]: That's a very strong possibility, yes. Uh, I—I answered differently on the—the sheet that we filled out because I felt unattached somehow.

[PROSECUTOR]: Right. Exactly. It's a lot easier to in the abstract say yes, I believe in the death penalty. But it it [sic] is—it is a difficult burden to shoulder and some people just can't do that. And—and that's what we need to know. And I'm not trying to persuade you one way or the other. I just need to know your true feelings. And you understand if—if you feel this way and—and if your feelings are that strong, then do you really think you could be a fair and impartial juror in this case knowing that?

[VENIREMEMBER]: I've asked myself that. Uh, Judge Solis presented that question to us that day.

[PROSECUTOR]: Uh-huh.

[VENIREMEMBER]: And, uh, as a matter of fact, I think both the attorneys did. And, uh, it's something I've given a lot of thought to, and I don't really have an honest answer at this time. I maybe I could; maybe I couldn't. But, uh, I know right now I would have a very difficult time with it. And then—and when that came up, uh, I don't know. I honestly don't know.

[PROSECUTOR]: All right. I'll [sic] going to have to push you here and I'm going to have to push you into an answer. "I don't know" is not enough for us to go on to make a decision in this case. We have to know how you feel.

\* \* \* \* \* \*

Are you telling me that your feelings are so strong, not wanting to do it yourself, not being able to do it yourself, that you—that you couldn't answer these questions based on the evidence? That you would automatically answer one of these questions "no" so that the Defendant would not get the death penalty?

[VENIREMEMBER]: It's—it's, uh, not so much what is there, as what's inside of me.

[PROSECUTOR]: Uh-huh. And what is that?

[VENIREMEMBER]: I—I was, uh, I was in Southeast Asia for two and a half years, and I know I was doing what I was told to do, but I dealt with a tremendous sense of guilt for twelve years and lost a family over it. And I don't think I want to do that again.

\* \* \* \* \* \*

[PROSECUTOR]: All right. And I take it you had to—to kill people while you were over there?

[VENIREMEMBER]: (No audible answer.)

[PROSECUTOR]: And you don't think you could do that again, is that what you're telling me?

[VENIREMEMBER]: No.

[PROSECUTOR]: So knowing that two "yes" answers would mean that the man over here would die, no two ways about it—

[VENIREMEMBER]: I could be swayed, yes.

[PROSECUTOR]: —you think you would answer one of these "no" because—

[VENIREMEMBER]: Very possibly. Right now, I couldn't. I couldn't do it.

[PROSECUTOR]: You could not do it?

[VENIREMEMBER]: No.

[PROSECUTOR]: Under no set of circumstances? Let's say the horriblest facts you could imagine, under this—under no set of circumstances feeling the way you do about life and death, are you telling me that you could not answer both these questions "yes" knowing that that man over there would die?

[VENIREMEMBER]: I couldn't do it personally, no.

Further questioning reflects:

[APPELLANT'S ATTORNEY]: You see what I'm driving at here, you're going to have to take this oath and you can't violate that oath once you take it. And it's important for we lawyers to know if you're going to, uh, be put in a position where you would have to violate your oath and answer these questions contrary to what the evidence and the law is to reach a certain result. Do you see what I'm saying?

[VENIREMEMBER]: Yes.

[APPELLANT'S ATTORNEY]: How do you, uh, where are you in this? Would you have to violate your oath? I know it's a tough question.

[VENIREMEMBER]: It's what I would have to deal with after it's over that makes it so difficult.

\* \* \* \* \* \*

[APPELLANT'S ATTORNEY]: You're going to have to take an oath to sit as a

juror. And that oath is will your verdict—will your answers to these questions be based on the evidence and upon the law, or would you have to violate that oath to reach a result?

[VENIREMEMBER]: Until I'm in that situation, I can't give you a completely honest answer, but I know it would be extremely difficult at the time.

[APPELLANT'S ATTORNEY]: I know that. I know it would be very difficult for you. Some people don't have that kind of difficulty and I know that you do. But if you have to answer that right now, knowing the way you feel about it, okay? Would you violate your oath?

[VENIREMEMBER]: I'm afraid that I might.

[APPELLANT'S ATTORNEY]: Okay. And that's because of your feelings that you would have to deal with, the ramifications—

[VENIREMEMBER]: Right.

[APPELLANT'S ATTORNEY]: —of your answers in the future?

[VENIREMEMBER]: That's right.

[APPELLANT'S ATTORNEY]: Is that right? Can you think of any situation where you could answer these questions "yes" and not violate your oath?

[VENIREMEMBER]: If—if possibly the law that called for the death penalty, but that's not the case.

\*    \*    \*    \*    \*    \*

[APPELLANT'S ATTORNEY]: Okay. Can you put aside those feelings regarding the death penalty and do your duty as a juror?

[VENIREMEMBER]: I've asked myself that question several times.

[APPELLANT'S ATTORNEY]: Well, I know you've given it some thought because you answered one way on your questionnaire and now you're telling us something different, so I know you've given it some thought. But you understand how important it is for we lawyers to—to understand how you feel about it and to ask you, are you going to have to violate your oath to reach a result to avoid the death penalty in this case?

[VENIREMEMBER]: I'm just afraid that I would, I honestly honestly [sic] think at this time, yeah.

[APPELLANT'S ATTORNEY]: Okay. Pass the juror.

THE COURT: Okay. [The veniremember], what—from your—your answers to the lawyers' questions, then as I take it, your feelings on the death penalty—and certainly we—we can appreciate them—would substantially or could possibly substantially impair your ability to answer those questions based on the evidence and solely on the evidence; these feelings that you've got regarding the death penalty and knowing the results of those answers to the questions, uh, those feelings would substantially impair your ability to answer those questions solely from the evidence; is that what you're telling me?

[VENIREMEMBER]: Yes, sir.

[PROSECUTOR]: I'm sorry. I didn't hear your answer.

[VENIREMEMBER]: My answer is "yes."

Appellant timely objected to the trial court's granting of the State's challenge for cause to this veniremember.

The proper standard to be used in disqualifying a prospective juror in death penalty cases is whether that juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851 (1985); *DeBlanc v. State*, 799 S.W.2d 701, 716 (Tex.Cr.App.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991). On appeal we recognize that great deference must be given to the trial court who is in the best position to see and hear the prospective jurors and to evaluate their

responses. As such, we will reverse a trial court's ruling on such issues only when the record shows a clear abuse of discretion on the trial court's part. *Davis v. State*, 782 S.W.2d 211, 216 (Tex.Cr.App.1989), *cert. denied*, 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 520 (1990). Based upon our review of the entire questioning of the challenged veniremember, including the dialogue detailed above, we find no abuse of discretion in sustaining the State's request that he be stricken for cause. We therefore overrule point of error number eleven.

### III.

### EVIDENTIARY RULINGS

Points of error numbers four, eight, and nine relate to trial court rulings regarding the admissibility of evidence. Point number four complains of error in admitting evidence seized as a result of appellant's arrest for public intoxication. As noted earlier, when booked into jail for public intoxication, appellant had two rings, identified as belonging to the decedent, in his pants pocket. It is those rings which appellant now claims should have been suppressed.

■ We observe that appellant failed to object to the admission of the rings when they were offered and received into evidence at trial. Though he did vigorously and specifically object to them as evidence "illegally obtained and fruits of an illegal arrest" at a hearing outside the jury's presence, when they were much later actually offered into evidence, appellant's response was, "No objection." Appellant's response of "no objection" waived his claim to inadmissibility of the challenged evidence. *See Gearing v. State*, 685 S.W.2d 326, 329 (Tex. Cr.App.1985); *Harris v. State*, 656 S.W.2d 481, 484 (Tex.Cr.App.1983); *Nichols v. State*, 504 S.W.2d 439, 440 (Tex.Cr.App. 1974); *Reed v. State*, 487 S.W.2d 78, 80 (Tex.Cr.App.1972). We therefore overrule point of error number four.

Point number eight avers that the trial court erred in refusing to grant a mistrial after evidence of extraneous arrests was presented to the jury. Two instances of testimony are challenged. The first involved testimony of a police officer to the effect that he had pulled appellant's arrest jacket from the sheriff's department during his investigation. The second involved a fingerprint identification officer being questioned about making comparisons between a bloody fingerprint retrieved from the crime scene and appellant's records.

■ With regard to the second instance of records being mentioned, the jury was actually present for the following exchange:

> [PROSECUTOR]: And did you have occasion to retrieve the records of [appellant]?

> [APPELLANT'S ATTORNEY]: Objection, Your Honor. May the jury be excused?

> THE COURT: Let me ask you the [sic] step out into the jury room for just a few minutes. Call you back in a minute.

After the jury was excused appellant then objected to the "reference to previous criminal records of [appellant]" and moved for a mistrial. Whereupon there were discussions amongst the attorneys, the trial court, and the witness. It was finally concluded that the "record" from which the fingerprint comparison was made was from the jail booking of the previously mentioned public intoxication arrest. It seemed to have been agreed that evidence of that previous arrest had already been introduced into evidence.[4] The trial court then ruled that testimony regarding records arising therefrom would be admitted but that anything from any other arrest would not. The court then stated that it overruled appellant's objection to the ex-

---

4. We note that the record does reflect that testimony regarding that public intoxication arrest had been admitted into evidence, over appel- lant's "extraneous offense" objection. Appellant does not now challenge the admissibility of that evidence.

tent that it goes beyond that, but sustained it to the extent that it only allows the witness to go into the public intoxication arrest. Appellant then requested that such be clarified to the jury, whereupon the State interrupted and stated that it would be happy to do so during its examination of the witness. Such seemed to satisfy appellant both at that time and when the jury was returned because he made absolutely no objection when the witness spoke explicitly about obtaining appellant's fingerprints from the public intoxication arrest records. We thus conclude that there was no error in denying appellant's motion for mistrial (remembering that such is the basis for his point of error) because there was nothing improper about the question to which appellant objected, as such question merely asked about "records" rather than "arrests" or "arrest records" and in no way inquired about or alluded to extraneous offenses. (In fact, as noted above, when the State did shortly thereafter elicit testimony about the public intoxication extraneous offense, there was no objection.)

■ The first instance of challenged questioning, in which "pull[ing] an arrest jacket" from the sheriff's department was mentioned, also involved a prompt objection by appellant and the jury being excused while the parties argued the merits of the objection. During these discussions, it was determined that the witness was referring to a jail file which he had inspected to obtain information about appellant during the course of his investigation. He did not testify as to any specific arrest which he may have gleaned from the file.[5] The State promised that it would not elicit any such details. Nevertheless, appellant proceeded with his objection to the initial testimony before the jury because "the damage ha[d] already been done" and moved for a mistrial, which the trial court denied. The jury was returned, whereupon the court instructed that the testimony referring to

obtaining "some arrest records or jail records or evidence of that nature" was not to be considered for any purpose and to "just disregard that evidence." Appellant again moved for a mistrial, alleging that "[a]n error ha[d] been committed to which no instruction [could] cure," which the trial court again denied. The witness proceeded to testify that he had received information relevant to appellant but without referring to any arrest record or jail file.

■ Appellant has properly preserved his claim of error by timely objecting to the testimony, securing a curative instruction from the trial court, and moving for a mistrial. *Coe v. State*, 683 S.W.2d 431, 436 (Tex.Cr.App.1984). However, except in extreme cases, if the trial court sustains a timely objection and instructs the jury to disregard an improper response referring to an extraneous offense, the error is cured. *Barney v. State*, 698 S.W.2d 114, 125 (Tex.Cr.App.1985); *Coe v. State*, 683 S.W.2d at 436. We find that any potential error in the witness's mentioning of an arrest jacket was cured by the trial court's instruction to disregard; thus there was no error in denying the motion for mistrial. Based upon our conclusions regarding both instances in which a mistrial was sought, we overrule point of error number eight.

■ Point number nine complains of the trial court's exclusion of cross-examination testimony offered to show witness bias and motive. That witness, a West Virginia deputy sheriff who had had encounters with appellant in years past, testified at punishment. Outside the presence of the jury, it was established that appellant wanted to cross-examine the witness regarding a civil law suit which a prisoner had filed against the witness and several other officers alleging deprivation of civil rights. In making his bill of exceptions, appellant elicited testimony from the witness that that suit had been resolved by a

---

5. While the jury was out, the witness did state that the file contained "a bunch of arrests" and "a multitude of offenses that [appellant] had been arrested on." However, he did not specifi-

cally identify or describe any of those arrests and never made mention of them at all in the jury's presence.

monetary settlement which was paid by his insurance company with contributions from the other officers. The witness also testified that no other charges were filed against him based upon that incident and that he was never disciplined on account of that complaint.

Appellant claims that the excluded testimony was admissible to prove bias and motive of the witness. However, Rule 608(b) of the Texas Rules of Criminal Evidence provides that specific instances of conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence. We have said that this rule, by its terms, is very restrictive and allows for no exceptions. *Ramirez v. State,* 802 S.W.2d 674, 676 (Tex.Cr.App.1990). Nevertheless, although appellant does not argue them, constitutional considerations are of some import to this issue.

The Confrontation Clause of the Sixth Amendment of the United States Constitution guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. Such confrontation includes the opportunity for cross-examination to attempt to expose a witness's motivation in testifying. *Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683 (1986). Thus, it is not within a trial court's discretion to prohibit a defendant from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of a witness. *Hurd v. State,* 725 S.W.2d 249, 252 (Tex.Cr.App. 1987). However, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based upon concerns about, among other things, harassment, prejudice, confusion of the is-

sues, the witness's safety, or interrogation that is repetitive or only marginally relevant. *Delaware v. Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435, 89 L.Ed.2d at 683.

Appellant does not specifically explain precisely how this previously settled civil law suit by some anonymous West Virginia prisoner indicates any bias or motive by the witness against appellant. At trial, he seemed to argue that such pertained to the witness's "character for truth and voracity [sic]" and that the civil suit was a reflection on his "testimony" and "credibility thereof." We are unable to discern any such indicia of bias or motive which could be perceived from the excluded testimony. Such testimony could at absolute best be considered interrogation of the type that is "only marginally relevant" and is thus reasonably limitable. We therefore conclude that there was no abuse of discretion in disallowing the proffered cross-examination testimony.[6] Point number nine is overruled.

### IV.

### REQUESTED JURY CHARGE INSTRUCTIONS

■ Points twelve and thirteen claim error in the trial court's refusal to include requested instructions in the jury charge at guilt/innocence. Point number twelve avers error in refusing appellant's requested jury charge instruction defining "reasonable doubt." He maintains that "[d]ue [p]rocess requires that it is time for Texas to join the vast majority of federal and state courts in requiring a jury instruction defining reasonable doubt." He adds that "[d]ue [p]rocess should require, particularly in capital cases, the abolition of yet another aspect of our 'system of law and of justice that leaves to the uncontrolled discretion of ... juries' the determination of guilt beyond a reasonable doubt," quoting *Furman v. Georgia,* 408 U.S. 238, 253, 92

6. We note that this situation is obviously not akin to a case in which a State's witness himself has filed suit against the accused. *See Cox v.*

*State,* 523 S.W.2d 695, 700 (Tex.Cr.App.1975); *Rhodes v. State,* 387 S.W.2d 413 (Tex.Cr.App. 1965).

S.Ct. 2726, 2734, 33 L.Ed.2d 346, 357 (1972). At the time of appellant's trial, it was well-settled that no definition of "reasonable doubt" need be included in the jury charge.[7] *Marquez v. State,* 725 S.W.2d 217, 241 (Tex.Cr.App.1987); *Pierce v. State,* 159 Tex.Crim. 504, 265 S.W.2d 601 (1954); *Gallegos v. State,* 152 Tex.Crim. 508, 215 S.W.2d 344 (1948). We therefore overrule point number twelve.

■ Point of error number thirteen complains of the trial court's refusal to submit appellant's requested jury charge instruction "on theft as an afterthought negating murder during the course of robbery." That requested instruction is as follows:

> You are further instructed that theft, as an afterthought to murder or the acts which ultimately caused the death of an individual, does not constitute the crime of capital murder. If a person commits the offense of murder and the offense of theft, but the specific intent to rob does not occur simultaneous to or prior in time to the murder or the acts that caused the death, then the offense committed is murder and theft as an afterthought. Therefore, if you believe from the evidence beyond a reasonable doubt that the defendant committed the offense of murder but did not form the intent to commit theft until after the murder or the acts which caused the death of the individual, you will find the Defendant not guilty of capital murder and consider the lesser included offense of murder.

Appellant claims that because there was testimony regarding expensive property in the decedent's home after she was killed, such was unrebutted exculpatory evidence. He asserts that "[e]xclusion of the requested charge on theft as an afterthought, precluded the jury's full consideration of exculpatory evidence on [the issue of the necessary nexus between the murder and the theft]."[8]

As appellant correctly states, proof of a robbery committed as an afterthought and unrelated to a murder would not provide sufficient evidence of capital murder pursuant to TEX.PENAL CODE ANN. § 19.-03(a)(2) (Vernon Supp.1988). *O'Pry v. State,* 642 S.W.2d 748, 762 (Tex.Cr.App. 1982) (Opinion on Rehearing). For such sufficiency, the State must prove a nexus between the murder and the theft, i.e. that the murder occurred in order to facilitate the taking of the property. *Ibanez v. State,* 749 S.W.2d 804, 807 (Tex.Cr.App. 1986). However, the issue before us is whether appellant was entitled to the above-quoted requested jury charge instruction.

Appellant bases his claim primarily in reliance upon *Palafox v. State,* 608 S.W.2d 177 (Tex.Cr.App.1979) which held that when the State puts into evidence a confession of the accused which includes statements that exculpate the accused it is then bound to disprove that defensive material. Since the case at bar does not involve any such confession or statement by appellant, *Palafox* is not applicable.[9]

The jury charge given included instructions defining the terms murder, capital murder when in the course of committing or attempting to commit robbery, robbery,

**7.** We note that such a definition has since been mandated. *See Geesa v. State,* 820 S.W.2d 154 (Tex.Cr.App., No. 290–90, delivered November 6, 1991).

**8.** We do observe that the record reflects that the jury's verdict explicitly found guilt as alleged in the allegations of both paragraphs which were submitted, i.e. of committing murder in the course of committing or attempting to commit both robbery and aggravated sexual assault. We express no opinion as to how this comports with TEX.CODE CRIM.PROC.ANN. art. 37.-07(1)(a) (Vernon 1981) which states that the verdict in every criminal action must be general.

**9.** We note that for cases tried after the effective date of TEX.R.CRIM.EVID. 607, the State is not bound by exculpatory statements which previously fell under the voucher rule pursuant to *Palafox, supra. Russeau v. State,* 785 S.W.2d 387, 390 (Tex.Cr.App.1990). The instant cause was tried long after the effective date of Rule 607.

theft, "in the course of committing theft," "attempt to commit" an offense, and "in the course of committing" robbery. It also included an instruction that stated, "Before you would be warranted in convicting the defendant of capital murder, you must first find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant was engaged in the commission or attempted commission of the felony offense of robbery ..., of [the decedent], as defined in this charge, but also that during the commission, or attempted commission thereof, if any, the defendant strangled [the decedent] with the intention of killing her." Its application paragraph specifically required a finding that appellant, "while in the course of attempting to commit or committing" the alleged robbery, intentionally committed the alleged murder.

These instructions required a finding that the murder took place during the commission or attempted commission of the robbery. The instructions in the jury charge provided the same guidance as did those requested by appellant. It is well-settled that when the charge refused is substantially the same as or is adequately covered by the charge given, no harm is shown. *Philen v. State*, 683 S.W.2d 440, 445 (Tex.Cr.App.1984); *Sheppard v. State*, 545 S.W.2d 816, 819 (Tex.Cr.App.1977). Because the trial court's jury charge "distinctly set[s] forth the law applicable to the case" per TEX.CODE CRIM.PROC.ANN. art. 36.14 (Vernon Supp.1989), there was no error in refusing to include appellant's requested instruction. *Demouchette v. State*, 731 S.W.2d 75, 79 (Tex.Cr.App.1986), *cert. denied*, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). We therefore overrule point number thirteen.

## V.

### PUNISHMENT ISSUES

■ Points of error numbers one, two, and seven relate to issues arising at the punishment phase of the trial. Point number two avers error in allowing into evidence hearsay testimony, over timely objection, from the father of a young girl who had made statements indicating that appellant had sexually assaulted her. That young girl, appellant's stepdaughter, had previously testified to the details of the alleged prior assault. The stepdaughter had been cross-examined about whether her mother was getting her to make the allegation. There was also questioning as to the child not having informed her mother of the alleged assault at the time it occurred or even by the last time they had met with appellant's attorney at his office. Appellant in his brief does indicate that the testimony of the child had been impeached.[10]

Appellant's objection to the father's testimony at trial was that such was hearsay. The State responded that "this is an outcry witness" and that he was testifying to the fact that a complaint was made pursuant to the outcry. Appellant then responded that the outcry testimony would only be admissible in the trial of that offense itself. On appeal, appellant further claims that such "outcry" testimony was hearsay and was inadmissible because it "did not meet the requisites of [Article 38.072 of the Code of Criminal Procedure]." He specifically avers that said statute does not even apply during a capital murder trial because such crime is not included among the offenses listed in section one of that article.

Suffice it to say that Article 38.072 does not apply in the instant cause. More relevant to the challenged testimony is TEX. R.CRIM.EVID. 801(e)(1)(B) which provides that a statement is not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statement, and the statement is consistent with the testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive. The declarant, appellant's step-

---

10. Specifically appellant's brief seeks reversal because of "... the inadmissible hearsay statements which bolstered the *impeached* testimony of the child...." (Emphasis added.)

daughter, had testified at the trial, and was subject to cross-examination concerning the statement. The statement was consistent with prior testimony that appellant had assaulted the declarant. It did rebut the implied charge of recent fabrication or improper influence/motive which had arisen based upon the above-described impeaching cross-examination of the declarant.[11] We therefore conclude that the father's challenged testimony was not hearsay, as it was specifically excluded from the definition of hearsay via Rule 801(e)(1)(B), and was properly admitted into evidence. Thus as there was no error in overruling appellant's hearsay objection at trial, we overrule point number two.

■ Point of error number seven complains of five instances of jury argument at punishment which were purportedly outside the record and "calculated to arouse the passion and prejudice of the jury by matters not properly before them."[12] Appellant's timely objection to each was overruled. It is very well-settled that the scope of proper jury argument is: 1) summation of the evidence; 2) any reasonable deduction from the evidence; 3) an answer to the argument of opposing counsel; and 4) pleas for law enforcement. *Whiting v. State,* 797 S.W.2d 45, 48 (Tex.Cr.App.1990); *Compton v. State,* 607 S.W.2d 246, 253 (Tex.Cr.App.1980) (Opinion on Rehearing), *cert. denied,* 450 U.S. 997, 101 S.Ct. 1701, 68 L.Ed.2d 197 (1981). We shall examine the complained of arguments with a view to these parameters.

■ The first instance involved the prosecutor beginning his closing summation with the statement, "All you have to

do to get to go home is answer two questions." Appellant *immediately objected* "to the basis of the District Attorney's argument." He further complained stating, "That's not the situation here. It's whether you get to go home or not." When that *objection was overruled,* appellant then said that the argument was "outside the record," to which the trial court responded, "Overruled." Appellant's brief does not articulate in what manner the argument falls "outside the record." We are unable to discern such and conclude that there was no error in overruling the objection at trial.

■ The second and third instances involved references to appellant's supposed thought processes in walking away from the decedent and getting a telephone cord from another room, then in returning and tying it around her neck twice and putting a knot in it. Appellant again objected by stating that such was "an argument outside of the facts in this case," and "[o]utside of the record in this case," and "an appeal to facts outside the record." These objections were all overruled. We observe that the record reflects that there was testimony indicating that the decedent's body was found between the living room and the dining room with a telephone cord wrapped tightly around her neck, while a telephone, which was missing its cord, was found in the decedent's bedroom. There was also testimony by the medical examiner that the telephone cord was "wrapped tightly around [the decedent's] neck twice and ... tied in a knot at the front." Because the record does comport with the prosecutor's arguments, we conclude there was no error in overruling the objections at trial.

■ Appellant's brief specifies that his fourth objection is directed at the following

11. We also note that the implication of recent fabrication or improper influence/motive appears to be that the declarant's mother had persuaded her to lie, and that she did not inform her mother of the allegations until some time after the statement was made to her father. Thus, the statement was made before the motive for fabrication, i.e. her mother's alleged urgings, arose. Such is required to come within the scope of Rule 801(e)(1)(B). *Haughton v. State,* 805 S.W.2d 405, 408 (Tex.Cr.App.1990); *Camp-*

*bell v. State,* 718 S.W.2d 712, 717 (Tex.Cr.App. 1986).

12. Specifically, point of error number seven reads, "Did the trial court err in denying [a]ppellant's timely objections to jury arguments outside the record[?]" while restated avers that "[t]he trial court erred in denying [a]ppellant's timely objections to jury arguments outside the record."

statement by the prosecutor: "Because no matter where he is, he can get out." Appellant immediately objected that such "calls for speculation on the law of pardons and paroles" and "[i]nviting the jury to speculate on that." After the prosecutor responded that he thought he could argue the evidence in this case, appellant responded, "I don't think that is evidence in this case." The trial court overruled the objection. On appeal, appellant claims that such argument was outside the record.

The above quoted argument was a part of the prosecutor's discussion about Special Issue Number Two, which dealt with appellant possibly being a continuing threat to society. The record reveals that parole was discussed, without any objection, during direct and cross-examination of one of appellant's own expert witnesses. This expert specifically stated, without objection, that "we don't have a life without parole statute in this state." [13] Again, because the record does include testimony corresponding with the prosecutor's challenged comment, we conclude there was no error in overruling the objections at trial.

■ The final challenge to jury argument involves the prosecutor's argument referring to a prior West Virginia conviction involving sexual misconduct by appellant. The prosecutor stated, "Now, they want to tell you it was a misdemeanor, but you heard the evidence. It's because she couldn't bring herself to testify." Appellant immediately objected that "that's outside the record," and "[t]here was no statement that she couldn't bring herself to testify," then added "[t]here's no evidence either, ..., that the State even tried to subpoena her." The trial court overruled the objections and stated, "The jury will have to recall the evidence and recall it yourself." On appeal, appellant claims that such argument was outside the record.

We observe that when asked why the sexual misconduct offense had been reduced to a misdemeanor, the West Virginia police officer testified, "Because the witness—the victim did not wish to testify in Court." There was no objection to that testimony. Again we conclude that the challenged argument was supported by the record and there was no error in overruling appellant's objections thereto. Based upon our conclusions regarding all five of appellant's complaints to punishment jury argument, we overrule point of error number seven.

■ Point number one alleges that "[t]he trial court erred in overruling appellant's objection to the charge on punishment that the jury was provided no guidance regarding its consideration of mitigating evidence and no way to express its reasoned moral response to such evidence in answering the special issues as required by the Eighth and Fourteenth Amendments to the United States Constitution." The record reflects that appellant submitted the following requested jury charge instruction:

You are instructed that if there is evidence before you regarding the Defendant's character, or conduct during previous periods of incarceration, or drug and alcohol abuse, or disadvantaged background then you may consider such evidence in answering the special issues and you may answer "no" to the special issues if you find any such evidence mitigates against the imposition of the death penalty.

Appellant also submitted a corresponding written objection to the jury charge, which was overruled, and had in fact submitted a written pretrial Motion to Hold Article 37.-071 of the Texas Code of Criminal Procedure Unconstitutional and Void, which was denied.[14]

---

**13.** This testimony was in the context of the witness discussing research which he had done on the subsequent behavior of people who had received life sentences or been on death row in prison, some of whom had been released from prison.

**14.** The objection stated:

The jury charge did include somewhat similar instructions from the trial court, specifically:

> You are further instructed that in determining each of these Special Issues you may take into consideration all of the evidence submitted to you in the full trial of the case, that is, all of the evidence submitted to you in the first part of this case wherein you were called upon to determine the guilt or innocence of the defendant, and all of the evidence, if any, admitted before you in the second part of the trial wherein you are called upon to determine the answers to Special Issues hereby submitted to you.

> You may consider in answering the Special Issues, any facts and circumstances presented in aggravation, extenuation or mitigation thereof.

The record reveals that appellant presented testimony from thirteen witnesses at punishment. These included his mother, father, brother, sister-in-law, several local friends, two experts (a forensic psychologist and a doctor of sociology), and the county jail's disciplinary records custodian. Appellant details several portions of the testimony which he alleges present evidence which mitigates against imposition of the death penalty, according to contemporary social standards, but which fell outside the scope of the Special Issues which were submitted.[15] This delineated evidence consists of the following:

1) His mother testified that "one time to keep [appellant] from running away, [she] even handcuffed him over night" in the basement.

2) His brother testified that he and appellant did not have an easy childhood, and were mostly raised by their maternal grandmother, whose death in 1969 greatly affected appellant.

3) Appellant and his brother "never had nobody [sic] to show [them] what was right or wrong" because their grandmother let them "do whatever [they] wanted."

4) Appellant developed a drug and alcohol problem at age 16 after his grandmother died.

5) His brother testified that appellant had been committed to a mental institution for drug and alcohol treatment.

6) Appellant's sister-in-law testified that he was "a good person," "ha[d] a heart," and was "always trying to get approval, always trying to get people to like him."

7) His father testified that appellant had been a good worker.

8) A former cellmate, who was then presently working as a speaker-consultant with a church-based ministry, indicated that appellant had been involved in Christian activities while incarcerated in the past and had been able to live peaceably in prison.

9) There were no records of any disciplinary hearings or any record to indicate that

---

Defendant objects to the charge of the court because it fails to instruct the jury how it may consider evidence regarding the Defendant's character, or conduct during incarceration, or drug and alcohol abuse, or disadvantaged background in answering the special issues and that the jury may answer "no" to the special issues if it finds any such evidence mitigates against the imposition of the death penalty. The failure to so instruct is violative of Defendant's rights under the 8th amendment to the U.S. Constitution and Art. I, Sec. 13 of the Texas Constitution.
The motion alleged, among other things, that Article 37.071, as related to the Special Issues, did not allow the jury to be instructed as to the effect of mitigating evidence on its consideration of said issues, and that no Special Issue was mandated concerning the effect that mitigating

evidence could have on answering the issues in the affirmative; and thus such would result in the arbitrary imposition of the death penalty.

**15.** Pursuant to TEX.CODE CRIM.PROC.ANN. art. 37.071 (Vernon Supp.1989), the special issues read as follows:

*Special Issue No. 1*
Was the conduct of the defendant, John Glenn Moody, that caused the death of the deceased, [the decedent], committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

*Special Issue No. 2*
Is there a probability that the defendant, John Glenn Moody, would commit criminal acts of violence that would constitute a continuing threat to society?

appellant had committed any act of violence while in custody at the county jail.

10) The founder/director of a local ministry group indicated that while in jail, appellant had demonstrated a concern for his spiritual well-being and prayed frequently.

Appellant avers that "[t]he above summarized evidence is mitigating in the *Penry* sense" and that his "troubled background is necessarily a two[-]edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will commit criminal acts of violence in the future dangerous to society." *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) held that the special issues provided for by Article 37.071 of the Texas Code of Criminal Procedure unconstitutionally failed to allow a jury to fully consider and act upon particular mitigating evidence. That evidence, which fell outside the scope of the special issues, consisted of Penry's mental retardation and history of childhood abuse. *Id.* It has been held that not all mitigating evidence falls outside the scope of these special issues. *See Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *Boggess v. State*, 1991 WL 87597 (Tex.Cr.App.1991); *Black v. State*, 816 S.W.2d 350 (Tex.Cr.App.1991); *Boyd v. State*, 811 S.W.2d 105 (Tex.Cr.App.1991); *Ex parte Baldree*, 810 S.W.2d 213 (Tex.Cr. App.1991); *Ex parte Ellis*, 810 S.W.2d 208 (Tex.Cr.App.1991).

We conclude that appellant's cited evidence can be given its fullest mitigating effect through the Special Issues which were submitted at trial, particularly in light of the above-noted instruction that the jury may consider "any facts and circumstances presented in aggravation, extenuation or mitigation" in answering the Issues. *See Mooney v. State*, 817 S.W.2d 693 (Tex.Cr. App.1991); *Earhart v. State*, 823 S.W.2d 607 (Tex.Cr.App. No. 70,343, delivered September 18, 1991); *Lewis v. State*, 815 S.W.2d 560 (Tex.Cr.App.1991). Because appellant's cited evidence does not fall within the purview of *"Penry* evidence,"

there was no error in refusing to include his requested jury charge instruction. We therefore overrule point number one.

## VI.

### JURY MISCONDUCT

Point of error number six complains of the trial court's refusal to grant his motion for mistrial and motion for new trial based upon jury misconduct. It would appear that after the jury was retired to deliberate at guilt/innocence there was some conversation between one of the jurors and the court bailiff. The record reflects that after beginning deliberations, the jury submitted two written questions to the trial court wondering about the meaning of "venue" in the context of the jury charge. Apparently after some discussions with the attorneys, the trial court decided to and did submit an additional jury instruction explaining "venue." After the trial court announced its intention to submit the additional instruction, appellant's attorneys informed the court that it had come to their attention that it had been related to the jury that there had been a mistake in the jury charge which was going to be corrected and that an individual juror had been asked if they had arrived at a verdict yet, and if not, they would be taken to supper by 7:00 o'clock. Appellant moved that the jury be discharged. The trial court proceeded to return the jury and submit the additional instruction, whereupon the jurors returned to continue deliberations. Then appellant presented testimony from the court bailiff regarding his conversations with a juror.

The bailiff testified that while one of the jurors was standing in the hall smoking, he had stood with that juror and told him that if they wanted to go to supper at 7:00 o'clock reservations had been made for such. He also admitted that he "might have said that there was going to be a change" in the jury charge and that "the judge would talk to them about it." He also admitted that the only thing that he

asked the juror was "if they were getting close or something or the other like that before they might want to go to supper." He further stated that "he [the juror] said they was [sic] still deliberating." When explicitly asked whether he had communicated to the juror the fact that if they had not arrived at a verdict by 7:00 o'clock they would be taken to supper, the bailiff answered in the affirmative. Appellant then moved that the jury be discharged and a mistrial be declared. The trial court took the matter under advisement. Appellant then stated that in support of the motion and bill of exception he would "of course call the juror" involved. The trial court recessed and "adjourn[ed] in chambers."

Upon reconvening, appellant clarified his motion for mistrial, objecting to the communications between the bailiff and one of the jurors based upon several portions of the United States and Texas Constitutions, and Article 36.27 of the Texas Code of Criminal Procedure. He added that the comments injected additional matters not in evidence and that the conversation had the effect of a dynamite charge, especially if the jury returned a verdict before 7:00 o'clock.[16] The trial court then denied the request for a mistrial.

Later, appellant filed a motion for new trial alleging, among other things, that the above-described juror communication warranted a new trial. The bailiff again testified. Though he admitted that in mentioning the mistake in the charge there had been a reference to a specific court case, he was adamant that he had not asked whether the jury had taken a vote or deliberated. He testified that he did not really remember the juror saying anything, but rather he [the bailiff] did most of the talking. He

again admitted that he told the juror that they would go eat at 7:00 o'clock if they had not reached a verdict before that time. He explicitly denied stating that if they did not find him guilty by 7:00 o'clock they would go to supper. He insisted that he did not "discuss the guilt-innocence." He also testified that no other jurors were around during the conversation because that particular juror had stepped outside to smoke "because the other people didn't like cigarette smoke."[17]

Appellant himself then testified that the positioning of his lockup room/holding cell allowed him to hear the bailiff's conversation with the smoking juror. He claimed to have overheard the bailiff specifically ask "if they had come close to a verdict yet." The juror purportedly responded that they had not because the "women were having trouble" and that "[s]ome of them had taken notes" into the deliberation room. He also testified that the bailiff "commented that if they didn't reach a decision by 7:00 o'clock that he was going to take them to supper and then they would come back and they would be here until they reached a decision." On cross-examination, the State suggested that appellant had heard the particular styled case during the attorneys' discussions in the trial court's chambers, from which appellant admitted he had overheard conversations while he was in lockup. On further cross-examination, appellant remembered that he thought the last part of what the bailiff had said was "that he was [sic] going to bring them back until they come [sic] back with a guilty verdict," though he could not swear to such. Appellant's investigator testified that he had conducted a post-trial interview of the juror. The juror's purported answers to the interview questions seem to indicate that no

---

**16.** We observe that the record reflects that the jury was returned to the courtroom at 6:46 p.m. that day, whereupon its verdict was announced and received. The discussions on the record regarding the two jury questions and the bailiff conversation began at 5:41 p.m., with the jury

being returned and read the additional instructions at 5:45 p.m., whereupon the jury was removed to continue deliberations.

**17.** There is no indication of precisely how the bailiff acquired that bit of information.

conversations took place with the bailiff.[18] Apparently the juror was unavailable and inaccessible for subpoena service due to a military assignment in England. The trial court denied the Motion for New Trial.

Appellant now seeks reversal citing TEX. R.APP.PROC. 30(b)(7) which states, among other things, that a new trial shall be granted an accused "where a juror has conversed with any other person in regard to the case." It is undisputed that the bailiff conversed with the juror regarding the prospective eating arrangements at least with some respect to the timing of the jury's deliberations in this case. However, both appellant and the State correctly point out that we have held that while the rule against jurors conversing with unauthorized persons about a case is so strong that injury to the accused is presumed, such presumption is rebuttable and that there must be injury to the accused before a new trial is warranted. *Thomas v. State*, 699 S.W.2d 845, 853 (Tex.Cr.App.1985); *McMahon v. State*, 582 S.W.2d 786, 793 (Tex.Cr. App.1978), *cert. denied*, 444 U.S. 919, 100 S.Ct. 238, 62 L.Ed.2d 175 (1979); *Williams v. State*, 463 S.W.2d 436, 440 (Tex.Cr.App. 1971).

While the above-described rebuttable presumption analysis was used in cases involving Article 40.03(7) of the Texas Code of Criminal Procedure, said Article was repealed and replaced by TEX.R.APP.PROC.

30(b)(7), effective September 1, 1986. However, because Rule 30(b)(7) contains language virtually identical to Article 40.03(7), we shall review appellant's point of error using the same analysis.[19]

Issues of fact as to jury misconduct raised at a hearing on a motion for new trial are for the determination of the trial court. *Moreno v. State*, 587 S.W.2d 405, 412 (Tex.Cr.App.1979); *Beck v. State*, 573 S.W.2d 786, 791 (Tex.Cr.App.1978). The only really disputed fact is whether or not the bailiff's comments included any mention of when or if the jury found appellant guilty and if they had reached a verdict. Appellant did not below, nor does he now, claim that any conversations took place other than those described above or that any other juror ever heard them. There is no allegation or attempt at proving that whatever was said by the bailiff was further communicated to the remainder of the jury.

Clearly the bailiff's conduct was violative of TEX.CODE CRIM.PROC.ANN. art. 36.22 (Vernon 1981), which provides that no person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court. However, we are unable to discern any injury to the accused caused by such conduct. Appellant merely avers that because "the [S]tate simply did not rebut the presumption of harm to [him]," the trial

---

**18.** The investigator's testimony was consistent with his affidavit which was filed with the motion for new trial. Said affidavit recited in part:
"On March 20, 1989, ..., I visited with [the juror in question] and asked him the following questions:
"While the jury was deliberating did you hear anyone (baliff) [sic] ask any juror:
   (a) Have you found him guilty yet?
   (b) What's taking so long?
   (c) If you don't find him guilty by 7:00 p.m., we're going to eat.
   (d) Anything else?
Did [the bailiff] talk to anyone about the case?
"To each question, [the juror in question] responded, "no".
The investigator also testified that the juror had likewise answered "no" to questions about whether anyone had talked to him or any other jurors after they were sequestered, and whether

he had read or heard anything about the case after he was sequestered.

**19.** We are also mindful that also effective that date was TEX.R.APP.PROC. 81(b)(2), which provides that if the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment. However before we conduct a harm analysis, we must first determine if there was "error in the proceedings below," or as appellant states "err[or] in refusing to grant [his] Motion for Mistrial and refusing to grant [his] Motion for New Trial because of jury misconduct."

court erred in failing to grant his motions. However, due to the bailiff's testimony about the nature of the conversation, which refuted most of appellant's testimony, we hold that the State has sufficiently discharged its burden of rebutting the presumption of harm.[20] We therefore hold that the trial court did not err in refusing to grant appellant's motion for mistrial and motion for new trial. Accordingly, point of error number six is overruled.

Having reviewed all thirteen of appellant's points of error we affirm the trial court's judgment and sentence.

McCORMICK, P.J., concurs in result.

CLINTON, J., disagrees with disposition of points one and six and therefore joins only the judgment of the Court.

MALONEY, J., dissenting as to point number one.

---

20. We hasten to add that we are dismayed by the bailiff's conduct. We note that the bailiff testified that he had been in that position for four-and-a-half years and prior to that had been employed as a police officer for 30 years. It is unfortunate to think that the tremendous amount of time, effort, and resources of both the State and the appellant could have been wasted due to this obviously well-experienced seasoned bailiff's behavior.