ACCEPTED
01-14-00241-cr
FIRST COURT OF APPEALS
HOUSTON, TEXAS
1/9/2015 5:09:00 PM
CHRISTOPHER PRINE
CLERK

**No. 01-14-00241-CR**

In the
**COURT OF APPEALS**
For the
**FIRST SUPREME JUDICIAL DISTRICT**
at Houston

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/9/2015 5:09:00 PM
CHRISTOPHER A. PRINE
Clerk

_____

On Appeal from the 240th Judicial District Court of
Fort Bend County, Texas
Cause Number 11-DCR-057073

_____

**SEAN MICHAEL MCGUIRE, Appellant**
*v.*
**THE STATE OF TEXAS, Appellee**

_____

**APPELLANT'S BRIEF**

_____

*Counsel for Appellant*
*Sean Michael McGuire*

**KRISTEN JERNIGAN**
ATTORNEY AT LAW
STATE BAR NUMBER 90001898
207 S. AUSTIN AVE.
GEORGETOWN, TEXAS 78626
(512) 904-0123
(512) 452-1382 (Fax)
Kristen@txcrimapp.com

**ORAL ARGUMENT REQUESTED**

# IDENTIFICATION OF PARTIES

Pursuant to Texas Rule of Appellate Procedure 38.1, a complete list of the names of all interested parties is provided below so the members of this Honorable Court may at once determine whether they are disqualified to serve or should recuse themselves from participating in the decision of this case.

**Appellant:**

Sean Michael McGuire

**Counsel for Appellant**:

Michael W. Elliott
905 Front Street
Richmond, Texas 77469

Dawn Wright
812 Barrett Street
Richmond, Texas 77469

Kristen Jernigan
207 S. Austin Ave.
Georgetown, Texas 78626

Robert Swafford
2003 S. Lamar Blvd., Number 8
Austin, Texas 78704

**Counsel for Appellee, The State of Texas:**

John Healey
Fort Bend County District Attorney
Jeff Strange
Jason Bennyhoff
Sherry Robinson
Assistant District Attorneys
301 Jackson
Richmond, Texas 77469

**Trial Court Judge:**

The Honorable Thomas R. Culver, III
The Honorable Clifford Vacek
The Honorable Robert Kern
The Honorable Donald Higginbotham

# TABLE OF CONTENTS

IDENTIFICATION OF PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . .v

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

ARGUMENT & AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    (1)    The evidence is insufficient to support the jury's verdict.

    (2)    The trial court abused its discretion in denying Appellant's Motion for Change of Venue.

    (3)    The trial court abused its discretion in denying Appellant's challenge for cause of Juror Number One because she indicated a bias in favor of the State and against Appellant.

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

CERTIFICATE OF WORD COUNT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

# INDEX OF AUTHORITIES

## CASES

*Adanandus v. State*, 866 S.W.2d 210 (Tex. Crim. App. 1993) . . . . . . . . . . . . . . 24

*Bell v. State*, 724 S.W.2d 780 (Tex. Crim. App. 1986),
    *cert. denied*, 479 U.S. 1046 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) . . . . . . . . . . . . . . .14, 16

*Burks v. State*, 876 S.W.2d 877 (Tex. Crim. App. 1994) . . . . . . . . . . . . . . . .25, 26

*Clark v. State*, 717 S.W.2d 910 (Tex. Crim. App. 1986) . . . . . . . . . . . . . . . .25, 26

*Demouchette v. State*, 731 S.W.2d 75 (Tex. Crim. App. 1986),
    *cert. denied*, 482 U.S. 920 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Gonzalez v. State*, 222 S.W.3d 446 (Tex. Crim. App. 2007) . . . . . . . . . . . . . 20, 23

*Harris v. State*, 790 S.W.2d 568 (Tex. Crim. App. 1989) . . . . . . . . . . . . . . . . . 24

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Moody v. State*, 827 S.W.2d 875 (Tex. Crim. App. 1992) . . . . . . . . . . . . . . .25, 26

*Ransom v. State*, 789 S.W.2d 572 (Tex. Crim. App. 1989),
    *cert. denied*, 110 S. Ct. 3255, (1990) . . . . . . . . . . . . . . . . . . . . . . . . .20

*Smith v. State*, 907 S.W.2d 522 (Tex. Crim. App. 1995) . . . . . . . . . . . . . . . . . .25

*Wainwright v. Witt*, 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . .25, 26

*Williams v. State*, 565 S.W.2d 63 (Tex. Crim. App. 1978) . . . . . . . . . . . . . . 25, 26

## STATUTES AND RULES

TEX. CODE CRIM. PROC. Art. 31.03(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

TEX. CODE CRIM. PRO. Art. 35.16(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 26

TEX. R. APP. P. 38.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TEX. R. APP. P. 39.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v

TEX. CODE CRIM. PROC. Art. 31.03(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

TEX. CODE CRIM. PRO. Art. 35.16(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 26

# STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rule of Appellate Procedure 39.1, Appellant requests oral argument in this case.

**No. 01-14-00241-CR**

In the
**COURT OF APPEALS**
For the
**FIRST SUPREME JUDICIAL DISTRICT**
at Houston

_____

On Appeal from the 240th Judicial District Court of
Fort Bend County, Texas
Cause Number 11-DCR-057073

_____

**SEAN MICHAEL MCGUIRE, Appellant**
*v.*
**THE STATE OF TEXAS, Appellee**

_____

**APPELLANT'S BRIEF**

_____

**STATEMENT OF THE CASE**

Appellant was indicted for the felony offense of failure to stop and render aid. (CR: 6). On March 18, 2014, a jury found Appellant guilty and assessed Appellant's punishment at five years in prison and a $5,000 fine. (CR: 112). Appellant timely filed Notice of Appeal on March 19, 2014. (CR: 114). This appeal results.

1

## STATEMENT OF FACTS

At trial, Brenda Tovar told the jury that on August 1, 2010, she was at the intersection of FM 762 and FM 2977 at approximately 1:00 – 1:30 a.m. (RR4: 55). Tovar saw one headlight at the intersection of FM762 and Highway 59, which was some distance up the road. (RR4: 55). Tovar next saw a truck traveling down the road with something attached to its bumper. (RR4: 57). It was not until later that Tovar realized the object was a motorcycle. (RR4: 58). Tovar passed the truck and noticed that it was "high" with big tires on it. (RR4: 59). When Tovar passed the truck and the motorcycle, she did not see anyone lying on the ground. (RR4: 60). On cross-examination, Tovar agreed it was dark on the night of the accident in this case. (RR4: 63). She also agreed that she only saw a headlight, and not a taillight, on the motorcycle when she saw it prior to the accident. (RR4: 67). Tovar testified that at no time did she see anyone run a red light or speed. (RR4: 69, 70). After the accident, Tovar saw the truck turn around back to where she assumed a collision took place. (RR4: 72).

Kosher Deary was traveling home from work and turned left onto FM 762 from Highway 59 sometime after 11:30 p.m. on August 1, 2010. (RR4: 80, 82). Something caught his eye so he slowed and turned around. (RR4: 83). At first, he thought it was a deer or a dog, but when he got out of his car and walked closer,

he realized it was a person. (RR4: 85). Deary called 911, but did not believe the person was alive. (RR4: 84-85). On cross-examination, Deary agreed that there was a Shell gas station just across the freeway from where the body was lying. (RR4: 88). Deary stated further that the intersection of FM 762 and Highway 59 is a dangerous intersection because once through the intersection on FM 762, the right lane ends almost immediately and vehicles are forced to merge into one lane. (RR4: 93). Deary acknowledged that unfortunately, since the person lying on the side of the road was already deceased, there was no emergency or exigency in obtaining medical care. (RR4: 99).

James Ressler, a lieutenant with the Fort Bend County Sheriff's Office, told the jury that in the early morning hours of August 2, 2010, he was on patrol near FM 762 and FM 2977 when he saw a motorcycle on the side of the roadway. (RR4: 105). 911 had already been called by the time he arrived at 12:43 a.m. (RR4: 116). Ressler traveled to where two other people were located on the side of the road and observed a body lying against the guardrail. (RR4: 115, 117). Ressler did not believe the person was alive. (RR4: 117). When EMS arrived, there were no efforts to revive the person. (RR4: 118). A DPS trooper arrived five to ten minutes after Ressler. (RR4: 119). Ressler directed the trooper to a nearby Shell station because he received a call stating the driver of the vehicle

involved in the collision was there. (RR4: 121). On cross-examination, Ressler admitted that although he was the patrol supervisor on duty the night the accident in this case occurred, he did not make a report or take any notes. (RR4: 126).

Detective Bryan Leach with the Rosenberg Police Department testified that he was formerly related to Appellant by marriage and that although they live in the same area, he and Appellant did not see each other often. (RR5: 14). Leach explained that on August 2, 2010 he was at a bar called the Lone Star providing security for a benefit for an employee who was suffering from cancer. (RR5: 14). Leach indicated that Appellant was also present at the benefit with his wife. (RR5: 17). Leach left the Lone Star and was later awakened at home by a phone call from Appellant. (RR5: 18). Appellant was crying and stated that he had been in an accident and that he hit someone or something, but when he went back to look, he could not find anyone. (RR5: 18). Leach told Appellant to stay where he was and traveled to the Shell station where Appellant was. (RR5: 18, 21-22). Leach indicated that the Shell station was the most logical, and only lit, place to stop on the north side of FM 762. (RR5: 28). When Leach encountered Appellant at the Shell station, he walked up and hugged him. (RR5: 40). Leach, a licensed peace officer, did not detect the odor of alcoholic beverage on Appellant's person and did not observe any other signs of intoxication. (RR5:

42-43). In fact, Appellant had the full use of his mental and physical faculties. (RR5: 44). Leach testified that prior to trial, he met with the lead prosecutor, Jeff Strange, and during their conversation, told Strange that he could not testify that Appellant was the driver of the car.[1]

Alton Tomlin, a trooper with the Department of Public Safety, stated that on August 2, 2010, he had been a trooper for a year and a half. (RR5: 74). Tomlin was dispatched to the scene and when he arrived, several sheriff's deputies and an ambulance were also on scene. (RR5: 75-76). Tomlin went to the Shell station, approximately a tenth of a mile away, and spoke with Appellant. (RR5: 77). Appellant indicated that he had hit something but did not know what he hit. (RR5: 78). Trooper Tomlin testified that there was no damage to Appellant's windshield and that there as no indication that Stidman's body hit Appellant's windshield. (RR5: 118).

Michael Filmore, a trooper with the Department of Public Safety, testified that on August 2, 2010, he was the primary accident investigator in the

---

[1] Defense Counsel pointed out on the record that despite filing a written request for *Brady* disclosure more than a year before trial, the prosecutor never disclosed this information to the Defense. (RR5: 31-33). Outside the presence of the jury, Leach explained that he asked the prosecutor why he was being called as a witness, the prosecutor responded that he expected Leach to testify that Appellant was driving. (RR5: 35). Leach then explained to the prosecutor that he could not so testify because he did not know who was driving. (RR5: 35). The Court then cautioned the prosecutor regarding his duty to disclose exculpatory evidence. (RR5: 36).

5

Richmond/Rosenberg area. (RR6: 21). Filmore explained that Stidman's driver's license was suspended at the time of the accident and that if he had not been driving, this accident would never had occurred. (RR6: 77). Filmore agreed that there were no calls reporting any erratic or unlawful driving by Appellant prior to the accident. (RR6: 79). Filmore also agreed that immediately after the accident occurred, Appellant called Detective Leach and Chief Sheriff's Deputy Craig Brady. (RR6: 83-84). Filmore stated that the police cordoned off the area from the Shell station to where the accident took place and that police considered the scene "one big area." (RR6: 85). Filmore acknowledged that Appellant's truck was in working condition after the accident and that he could have left the scene. (RR6: 87). During Filmore's testimony, Defense Exhibit No. 2, a video taken from a surveillance camera at a nearby Walgreen's store was admitted into evidence. (RR6: 106). Although it was collected on August 3, 2010, the day after the accident, it was not turned over to defense counsel until the day before trial, despite repeated requests for this evidence. (RR6: 100-01). The prosecutor was admonished, outside the presence of the jury, regarding his duty to disclose exculpatory evidence. (RR6: 104). When the jury returned, Filmore testified that he was surprised defense counsel had only been given a copy of the videotape the day before trial. (RR6:

106).

Devon Wiles, a trooper with the Department of Public Safety, testified that on August 2, 2010, he responded to a call at FM 762 and Highway 59. (RR7: 115). When he arrived, he put Appellant in his patrol car and traveled to where the motorcycle was. (RR7: 118). Wiles spoke with Appellant and Appellant was coherent, providing appropriate responses. (RR8: 42). In fact, Wiles stated that he saw no signs that Appellant was intoxicated by the loss of normal use of his mental or physical faculties. (RR8: 44, 46). Wiles also stated that he knew of no evidence that would suggest Appellant was driving erratically or recklessly on the night of the accident. (RR8: 45).

Craig Brady, the former Chief Deputy of the Fort Bend County Sheriff's Office, testified that he, like Appellant, was a long-time resident of Fort Bend County and that he and Appellant knew each other through mutual friends and that several of their respective family members were friends. (RR10: 52). On August 1, 2010, when he was still employed as Chief Deputy, he received a phone call from Appellant between 12:30 a.m. and 12:45 a.m. (RR10: 53). Appellant was hysterical but explained that he had hit something, did not know what it was, and did not know what to do. (RR10: 54). Appellant told Brady he had turned around to try to determine what he hit, but was unable to. (RR10: 59).

7

Appellant told Brady he was scared and Brady told him to stay where he was and Brady would send an officer to talk to him. (RR10: 55). Brady clarified that Appellant never asked him to use his influence to get him out of trouble. (RR10: 68). In fact, Brady told the Sheriff's Office dispatch where Appellant was. (RR10: 79). Brady explained that Appellant lived only three miles from where the collision took place and that his home was in the opposite direction of the Shell station. (RR10: 59). When asked if the Shell station and the accident site were the same scene, Brady explained that "[i]t's very close." (RR10: 59). Brady explained further that he could see why someone who had an accident in that area would stop at the Shell station because it was the first public, open facility in the area and "a logical place to stop." (RR10: 59-60). When asked if the Shell station was the closest lit place for Appellant to stop and report the accident, Brady replied, "I can't think of any other place that would have been any closer." (RR10: 60). Brady then explained that in his career, he had numerous occasions to view video surveillance footage and thought video of that type would be helpful if it captured the particular area in question. (RR10: 62). Defense Exhibit 2, video from a surveillance camera at a Walgreen's store located near the intersection where the collision took place was then played for the jury. (RR10: 62). While watching the video, Brady explained that the video appeared to be a

8

continuous streaming feed, meaning there were no gaps, and captured the intersection where the collision took place between the times of 12:30 and 12:45 a.m. (RR10: 64). The video was shown and at its conclusion, Brady remarked, "I didn't see anything remarkable in the video at all." (RR10: 65). Brady stated further that it appeared traffic continued normally down the roadway and he never saw any sparks or anything being dragged down the roadway. (RR10: 65). Brady also stated that during the video, a single headlight could be seen but no taillight could be seen. (RR10: 66). It was clear the video reflected the intersection in question because later in the tape, police vehicles can be seen parked with their lights flashing. (RR10: 84, 88).

William Coltharp, a forensic engineer and President and owner of Coltharp Engineering Associates, testified that he has two degrees from the University of Texas in Engineering Science and Mechanical Engineering. (RR10: 93). In addition, he is a registered professional engineer and board certified in forensic engineering with thirty-five years experience in reconstructing accidents. (RR10: 93). Coltharp has testified as an expert approximately 100 times and has investigated over 1,000 vehicular accidents. (RR10: 95, 97). Coltharp came to look at the accident scene in this case on August 2, 2010. (RR10: 98). Notably, when traveling south on FM 762 across Highway 59, the road changes from two

lanes to one. (RR10: 111). There was no sign to indicate the merge and the speed limit was fifty-five miles per hour. (RR10: 111-13). Also on August 2, 2010, Coltharp inspected Stidman's motorcycle at a storage facility. (RR10: 114-15). His inspection revealed that other than significant damage to the seat, there was no other serious damage to the motorcycle, and certainly not indication it had slid on its side for over 800 feet. (RR10: 117-18). Coltharp explained that his review of the relevant documents and videos in this case revealed that at the scene, Appellant maintained he never saw a taillight. (RR10: 119). Coltharp testified that there is a specific test to determine whether a bulb was on at the time of a collision, and he asked to perform the test, but he was not allowed access to the bulb to perform it. (RR10: 120-23). Coltharp explained to the jury the principle of "motorcycle conspicuity," which is the study of how difficult motorcycles are to see by drivers of cars, and has been studied for fifty years. (RR10: 126). Coltharp explained further that conspicuity, or whether the motorcycle can be seen, has a "huge effect" on how likely it is to be involved in an accident. (RR10: 127). Coltharp related to the jury that Stidman's motorcycle was designed to be inconspicuous because it was built low to the ground, some chrome surfaces were painted black, and it had two small taillights instead of one large taillight. (RR10: 127). Through his research, Coltharp found that Harley

10

Davidson marketed this particular motorcycle for its "stealthfulness," how low it is to the ground, and its dark color. (RR11: 23-24). In sum, Stidman's motorcycle was designed to be difficult to see, which is very dangerous. (RR11: 24). In addition, Stidman's clothing made him inconspicuous because he was wearing a very dark black helmet, a black t-shirt, blue jeans, brown boots, and black gloves. (RR10: 129). Coltharp explained that the combination made Stidman very difficult to see, especially at night. (RR10: 129). Coltharp then explained that there was very little damage to both Appellant's truck and Stidman's motorcycle. (RR11: 6-10). Coltharp stated that when he inspected Appellant's truck, he found the rear fender of Stidman's motorcycle embedded in Appellant's brush guard. (RR11: 14). From his inspection, Appellant was able to determine that Appellant's truck impacted Stidman's motorcycle at the rear fender. (RR11: 16). When the impact occurred, Stidman's motorcycle was pointed in the same direction as Appellant's truck and directly in front of Appellant's truck on the passenger side. (RR11: 16). Based on the condition of Stidman's motorcycle and the condition of the roadway when he inspected it, Coltharp was also able to determine that after the impact occurred, Stidman's motorcycle remained upright and traveled with Appellant's truck for some distance. (RR11: 17). Coltharp related that because the motorcycle remained upright, there was no noise or sparks

11

to alert Appellant of the impact. (RR11: 19-20). Moreover, Appellant was unable to see Stidman's motorcycle because the hood of Appellant's truck, including its lift package, was much higher than where the motorcycle impacted. (RR11: 24-26). Coltharp also drove through the intersection at night on August 4, 2010, when the conditions were the same as they were the night of the accident. (RR11: 27-28). Coltharp indicated that the conditions were very dark because the moon had not risen. (RR11: 31-33). The jury was shown a video of the conditions and Coltharp driving through the intersection. (RR11: 34). Coltharp testified that through his research, he found that over half of the time, when a car hits a motorcycle, the driver of the car never saw the motorcycle. (RR11: 37-38). Coltharp determined that Appellant was not speeding when the accident occurred and it appeared Appellant's truck was traveling, completely under control, and simply hit a motorcycle he did not see, resulting in an unfortunate accident. (RR11: 39-40).

## ISSUES PRESENTED

(1)    The evidence is insufficient to support the jury's verdict.

(2)    The trial court abused its discretion in denying Appellant's Motion for Change of Venue.

(3)    The trial court abused its discretion in denying Appellant's challenge for cause of Juror Number One because she indicated a bias in favor of the State and against Appellant.

## SUMMARY OF THE ARGUMENT

Appellant's first point of error should be sustained because the evidence is insufficient to support Appellant's conviction where the State did not prove Appellant failed to remain at the scene.    Appellant's second point of error should be sustained because the trial court abused its discretion in denying Appellant's Motion for Change of Venue where the pre-trial publicity, which included untrue statements by the prosecutor that Appellant was "high on cocaine," was extensive and pervasive, resulting in an unfair trial.    Appellant's third point of error should be sustained because the trial court abused its discretion in denying Appellant's challenge for cause of Juror Number One when she indicated a bias in favor of the State and against Appellant.

## ARGUMENT & AUTHORITIES

**I.** ***The evidence is insufficient to support the jury's verdict of guilt.***

The evidence is insufficient to support the jury's verdict of guilt because the State failed to prove the elements of the offense of failure to stop and render aid beyond a reasonable doubt. The Court of Criminal Appeals has held that the legal sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307, 320 (1979), is the standard that a reviewing court should apply when determining the sufficiency of the evidence. *Brooks v. State*, 323 S.W.3d 893, 896 (Tex. Crim. App. 2010). When reviewing the legal sufficiency of the evidence, an appellate court views the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 320; *Brooks*, 323 S.W.3d at 896.

In order to convict Appellant as alleged in the indictment, the State was required to prove beyond a reasonable doubt that Appellant failed to remain at the scene of the accident until the operator complies with the requirements of Section 550.023. TEX. TRANSP. CODE § 550.021; (CR: 6). Texas Transportation Code Section 550.023 provides, in part, that the operator of a vehicle involved in an accident causing injury or death, "provide any person injured in the accident reasonable assistance, including transporting or making arrangements for

14

transporting the person to a physician or hospital for medical treatment if it is apparent that treatment is necessary, or if the injured person requests the transportation." TEX. TRANSP. CODE § 550.023(c)(1); (CR: 6).

The State failed to prove its case beyond a reasonable doubt because it did not prove Appellant failed to remain at the scene. Specifically, the record reflects that Tovar, who was at the scene when the collision occurred, did not realize Appellant hit a motorcycle and did not see Stidman's body when she passed the location of the collision. (RR4: 58, 60). In addition, after the accident, Tovar saw the truck turn around back to where she assumed the collision took place. (RR4: 72). Deary testified that, while something caught his eye when he was traveling down FM 2977, he initially thought it was a deer or a dog; and only after he got out of his car and walked closer, did he realize it was a person. (RR4: 85). Deary explained that the Shell gas station was just across the freeway from where the body was lying. (RR4: 88). Detective Leach related that when he spoke with Appellant immediately after the accident, he stated that he had been in an accident and that he hit someone or something, but when he went back to look, he could not find anyone. (RR5: 18). Leach, a certified peace officer, told Appellant to stay where he was at the Shell station. (RR5: 18, 21-22). Leach testified that the Shell station was the most logical, and only lit, place to stop on

the north side of FM 762. (RR5: 28). Tomlin stated that the Shell station was approximately a tenth of a mile away from where Stidman's body was and that when he spoke with Appellant, Appellant indicated that he had hit something but did not know what he hit. (RR5: 77-78). Tomlin testified that there was no damage to Appellant's windshield and that there as no indication that Stidman's body hit Appellant's windshield. (RR5: 118). Filmore testified that the police cordoned off the area from the Shell station to where the accident took place and that police considered the scene "one big area." (RR6: 85). Filmore acknowledged that Appellant's truck was in working condition after the accident and that he could have left the scene. (RR6: 87). Brady testified that when he spoke to Appellant immediately after the accident, Appellant reported that he had hit something, did not know what it was, and did not know what to do. (RR10: 54). Appellant told Brady he had turned around to try to determine what he hit, but was unable to determine what it was. (RR10: 59). Brady told Appellant to stay where he was and Brady would send an officer to talk to him. (RR10: 55). Brady clarified that Appellant never asked him to use his influence to get him out of trouble. (RR10: 68). In fact, Brady told the Sheriff's Office dispatch where Appellant was. (RR10: 79). Brady explained that Appellant lived only three miles from where the collision took place and that his home was in the opposite

16

direction of the Shell station. (RR10: 59). When asked if the Shell station was the closest lit place for Appellant to stop and report the accident, Brady replied, "I can't think of any other place that would have been any closer." (RR10: 60). Coltharp determined that simply hit a motorcycle he did not see, resulting in an unfortunate accident. (RR11: 39-40).

The evidence in this case shows that Appellant did not know what he hit, turned around to try to see what he hit, traveled to the closest lit location to report the accident to law enforcement, and was instructed to stay at that location by law enforcement. Appellant lived only three miles away and his truck was operational; so, he could have left the scene, but did not.

The State simply failed to prove one of its required elements beyond a reasonable doubt; namely: that Appellant failed to remain at the scene. *See* TEX. TRANSP. CODE §§ 550.021, 550.023. Accordingly, Appellant's first point of error should be sustained. *See Jackson*, 443 U.S. at 320; *Brooks*, 323 S.W.3d at 896.

## II. *The trial court abused its discretion in denying Appellant's Motion for Change of Venue.*

The trial court abused its discretion in denying Appellant's Motion for Change of Venue because the pre-trial publicity in this case was pervasive and unfairly prejudicial. Section 31.03(a)(1) of the Texas Code of Criminal Procedure provides that a change of venue may be granted if the defendant

17

establishes that "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial." TEX. CODE CRIM. PROC. Art. 31.03(a)(1). The Defendant is required to proffer his affidavit as well as the affidavits of at least two credible persons, residents of the county where the prosecution is instituted in support of his motion. TEX. CODE CRIM. PROC. Art. 31.03(a).

Appellant was also charged with the offenses of murder and intoxication manslaughter resulting from the accident in this case.[2] The cause of action alleging murder and intoxicated manslaughter was tried together with the present cause of action.

On February 24, 2014, Appellant filed a Motion for Change of Venue based on pre-trial publicity. (CR2: 362-64). In the motion, Appellant informed the Court that he could not receive a fair and impartial trial because the pre-trial publicity in this case was pervasive and unfairly prejudicial. (CR2: 362-64). Attached to the motion were numerous articles which detailed the fact that the alleged victim in this case was a marine, that Appellant was suspected of

---

[2] Appellant's conviction for murder is currently on appeal in Cause Number 01-14-00240-CR. After Appellant was convicted of murder, the State charged him with intoxication manslaughter for the death of the same individual alleged in the murder case. (RR1 of hearing held on December 9, 2014: 6-7). Appellant filed a pre-trial writ of habeas corpus based on Double Jeopardy, which the trial court granted. (RR1 of hearing held on December 9, 2014: 19). The State has appealed the Court's ruling and that case is docketed as Cause Number 01-14-01023-CR.

18

drunk-driving, and comments from friends and the family of the alleged victim. (CR2: 365-85). In several of the articles, the lead prosecutor in this case was quoted as saying Appellant was "high on cocaine" at the time the accident in this case occurred and that that was the reason for re-indicting Appellant for the offense of murder. (CR2: 385, 388, 389). The motion included affidavits from eight Fort Bend County residents explaining that Appellant, in their opinion, could not receive a fair trial because of the prejudicial and pervasive pre-trial publicity. (CR2: 395-408). A hearing was held on Appellant's Motion to Change Venue on March 7, 2014. (PTRR5: 5). During the hearing, testimony was taken in which witnesses testified they did not believe Appellant could receive a fair trial based on the pre-trial publicity, and specifically, because of the prosecutor's statements that Appellant used cocaine. (PTRR5: 16, 20-21, 25). Witnesses also testified that the pre-trial publicity in this case was pervasive and extensive. (PTRR5: 20-21, 25). Despite this testimony, the trial court denied Appellant's motion. (PTRR5: 41).

On March 10, 2014, Appellant filed a Supplemental Change of Venue and a hearing was held that same date. (CR3: 474-76). At the hearing, defense counsel argued again that because of articles in the local newspaper, in which the lead prosecutor made statements that Appellant was "high on cocaine" at the time

of the accident in this case, a change of venue was warranted. (RR2: 19). Specifically, an article was published in the Fort Bend Herald Coaster on March 9, 2014, the day before trial, and stated that not only was Appellant "high on cocaine," but also that the prior motion for change of venue was denied. (RR2: 19). The article also detailed the accident, and that Appellant killed a veteran. (RR2: 19). The trial denied Appellant's Motion for Change of Venue. (RR2: 21).

To prevail on a motion to change venue, a defendant must demonstrate that publicity about the case is pervasive, prejudicial, and inflammatory. *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007). The two primary means of discerning whether publicity is pervasive, prejudicial, and inflammatory are a hearing on the motion to change venue and the voir dire process. *Id.* In examining whether the pretrial publicity is prejudicial and inflammatory, a trial court may take three matters into consideration: (1) the nature of the publicity, (2) any evidence presented at a change of venue hearing, and (3) testimony received from veniremembers at voir dire. *Id.* at 451. A trial court's ruling denying a Motion for Change of Venue is reviewed under an abuse of discretion standard. *Ransom v. State*, 789 S.W.2d 572, 578-579 (Tex. Crim. App. 1989), *cert. denied*, 110 S. Ct. 3255, (1990).

20

During voir dire, the panel was asked if they had heard anything about this case. (RR3: 8-9). Five venire members volunteered that they had heard about it. (RR3: 9). One juror stated, in front of the rest of the venire members, that this case was in the newspaper three times, that he had to assume that what he read was correct, and that he was influenced by what he read. (RR3: 10). Another venire member stated that the details he read in the newspaper were "tragic." (RR3: 12). Yet another venire member related that what she had heard about this case would affect how she would decide this case. (RR3: 16).

In the present case, the media coverage was pervasive and unfairly prejudicial, especially in light of the fact that the prosecutor's comments that Appellant was "high on cocaine" were untrue. Midway through trial, outside the presence of the jury, a *Kelly/Daubert* hearing was held because Eduardo Padilla, the State's Chemist regarding the presence of cocaine in Appellant's blood, was not made available at the prior motion to suppress hearing. (RR8: 83-84). During the hearing, Padilla testified that on October 4, 2010, he received a blood sample from the Houston Crime Lab via Lone Star Overnight Delivery. (RR8: 87). Padilla's initial analysis of the sample showed a positive result for cocaine or its metabolites so another test was performed to determine exactly what the substance was. (RR8: 94). The secondary test showed a

cocaine metabolite in the amount of .07 milligrams per liter.  (RR8: 97).   On cross-examination, Padilla clarified that his test only concerned metabolites. (RR8: 106).   Defense Counsel then asked, "But you didn't do a test for actual cocaine?"  (RR8: 106).   To which Padilla responded, "We did look for cocaine, and the result was negative for cocaine."  (RR8: 106).   Defense Counsel asked again, "So we have a negative test for cocaine.  Is that right?"  (RR8: 106). Padilla replied, "Correct."  (RR8: 106).   Padilla indicated that information was not included in his report because only positive results are reported.   (RR8: 107). When asked if he told the prosecutor about the negative test, Padilla stated "Perhaps with the other prosecutor, Mr. Jeff Strange."[3]   (RR8: 107).   When asked if he thought it was Prosecutor Strange he told because he remembered his name, Padilla related, "I knew his name because he came down to the Austin lab to pick up the blood kit."  (RR8: 107).   Defense Counsel asked, "Jeff Strange picked up this blood sample himself?"   Padilla replied, "Yes, he was in Austin about two weeks ago, I believe." (RR8: 109).   Padilla testified that because a cocaine metabolite is inactive, it would have no affect on a person when his or her

---

[3]   Padilla's revelation was particularly troubling in light of the following statements made by Prosecutor Strange on the record:   "It's also important to know that [Defense Counsel] has been notified that we're going to go into the cocaine allegations.   He's had copies of the lab reports and copies of our expert lists for several years now. (RR4: 19).   "And at one point, I forgot what I gave him and what I didn't give him.   But I have basically given him everything that's in my file. And so I have also visited with my office and inquired whether or not there was anything exculpatory. And I know of no exculpatory evidence at this time. (RR2: 17).

blood was drawn and certainly not two hours before. (RR8: 113). After Padilla testified, the Court disallowed any testimony regarding cocaine or its metabolites. (RR8: 129). In sum, the prosecutor made statements to the press that Appellant was "high on cocaine" when, in fact, he was not.

In this case, the Court heard ample evidence at the hearing on the motion to change venue and during the voir dire process which showed the pre-trial publicity was pervasive and unfairly prejudicial. *Gonzalez*, 222 S.W.3d at 449. There were multiple articles, which detailed the accident and falsely alleged that Appellant was "high on cocaine." These articles influenced the public and veniremembers which unfairly prejudiced Appellant. Thus, the trial court abused its discretion in denying Appellant's Motion to Change Venue and his second point of error should be sustained.

**III.** ***The trial court abused its discretion in denying Appellant's challenge for cause of Juror Number One because she indicated a bias in favor of the State and against Appellant.***

The trial court abused its discretion in denying Appellant's challenge for cause of Juror Number One because she indicated she was biased in favor of the prosecution and against Appellant. In addition, she indicated she would consider Appellant's prior convictions for driving while intoxicated in determining whether he was guilty of driving while intoxicated in this case.

To preserve reversible error based on the trial court's erroneous denial of a challenge for cause, Appellant must show (1) he exhausted all of his peremptory challenges, (2) the trial court denied his request for additional peremptory challenges, and (3) a venireperson upon whom he would have exercised a peremptory challenge was seated on the jury. *Adanandus v. State*, 866 S.W.2d 210, 220 (Tex. Crim. App. 1993), *citing Harris v. State*, 790 S.W.2d 568, 581 (Tex. Crim. App. 1989); *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex. Crim. App. 1986), *cert. denied*, 482 U.S. 920 (1987); *Bell v. State*, 724 S.W.2d 780, 795 (Tex. Crim. App. 1986), *cert. denied*, 479 U.S. 1046 (1987).

During voir dire, Juror Number One stated she would be biased in favor of the prosecution especially in light of the allegation that this was Appellant's "third strike." (RR3: 88-89). Appellant challenged Juror Number One for Cause and argued the following:

> MR. SWAFFORD:      So, Judge, Juror No. 1 said that she would consider the two previous DWIs, if there were two previous DWIs in any case as to the issue of guilt or innocence on the third DWI. And she was real clear about it. (RR3: 175).

The trial court denied Appellant's challenge for cause. (RR3: 176). After Appellant exercised his peremptory strikes, defense counsel lodged the following objection:

MR. SWAFFORD: So, Judge, your Honor, we had to use a peremptory strike on Juror No. 31. And as a result, we were not able to use a strike on Juror No. 1, who was an objectionable juror for us. (RR3: 212).

Defense counsel requested an additional strike, but that request was denied. (RR3: 205, 212). Because Appellant moved to strike the juror in question, exhausted all of his peremptory strikes, requested an additional strike which was denied, and informed the trial court that an objectionable juror was seated, his point of error is properly preserved for appellate review. *Id*.

A challenge for cause may be made by the defense or the State if the juror "has a bias or prejudice in favor or against the defendant." *See* TEX. CODE CRIM. PRO. Art. 35.16(a)(9). The purpose of allowing jurors to be challenged for cause is to guarantee fair and impartial jurors for both the State and the defendant. *See Smith v. State*, 907 S.W.2d 522, 529 (Tex. Crim. App. 1995). A prospective juror should be excused for cause if his or her views would prevent or substantially impair the performance of their duties as a juror. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Moody v. State*, 827 S.W.2d 875, 888 (Tex. Crim. App. 1992). When a prospective juror is known to be biased or prejudiced as a matter of law, he or she must be excused when challenged, even if he or she states they can set aside the bias or prejudice. *Williams v. State*, 565 S.W.2d 63 (Tex. Crim. App. 1978); *Clark v. State*, 717 S.W.2d 910, 917 (Tex. Crim. App. 1986). A trial court's

25

ruling denying a defendant's challenge for cause of a prospective juror is reviewed under an abuse of discretion standard. *Burks v. State*, 876 S.W.2d 877, 893 (Tex. Crim. App. 1994).

In this case, Juror Number One was quite clear when indicating her bias. Specifically, she stated "If I'm honest, I raised [m]y card on the part about I say I lean a little more toward the prosecution, as far as a third strike kind of thing. I would try my best to be unbiased and do everything to follow the Judge's order. I absolutely would try. But I would be honest and say that I have a little bias towards the prosecution." (RR3: 88-89). Juror Number One was never rehabilitated. Because Juror Number One's bias is apparent from the record, she should have been excused when Appellant challenged her for cause, even considering she said she would try to follow the judge's orders. *Williams v. State*, 565 S.W.2d 63 (Tex. Crim. App. 1978); *Clark v. State*, 717 S.W.2d 910, 917 (Tex. Crim. App. 1986); TEX. CODE CRIM. PRO. Art. 35.16(a)(9). Clearly, Juror Number One was incapable of performing her duties to insure a fair and impartial trial and the trial court abused its discretion in denying Appellant's challenge for cause. *See Burks*, 876 S.W.2d at 893; *Wainwright*, 469 U.S. at 424; *Moody*, 827 S.W.2d at 888. Accordingly, Appellant's point of error should be sustained.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully prays that this Court reverse the judgment and sentence in this case.

Respectfully submitted,


_____/s/ Kristen Jernigan_____
KRISTEN JERNIGAN
State Bar Number 90001898
207 S. Austin Ave.
Georgetown, Texas 78626
(512) 904-0123
(512) 452-1382 (fax)
Kristen@txcrimapp.com


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Appellant's Brief has been mailed this, the 9th day of January, 2015 to the Fort Bend County District Attorney's Office, 301 Jackson Street, Richmond, Texas 77469.

_____/s/ Kristen Jernigan_____
Kristen Jernigan

27

## CERTIFICATE OF WORD COUNT

The undersigned hereby certifies that the foregoing document consists of 6,047 words in compliance with Texas Rule of Appellate Procedure 9.4.

_____/s/ Kristen Jernigan_____
Kristen Jernigan