

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00047-CR
_____

JOSHUA WADE ROBINSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 49922-A

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

Joshua Wade Robinson was convicted by a Gregg County jury of aggravated sexual assault[1] of K.A., a child,[2] and was sentenced to twenty years' imprisonment. On appeal, Robinson claims that the trial court erred in admitting, over his hearsay objections, the victim's notebook, an accusatory email, and certain trial testimony. Robinson claims that these alleged errors amounted to cumulative error that placed the integrity of the jury's verdict in doubt. Because we find no error in the admission of the disputed evidence, we affirm the trial court's judgment.

## I. Background

In September 2015, the Gregg County Sheriff's Department (GCSD) received a report that ten-year-old K.A. had been sexually abused.[3] The report was based on the allegations of K.A.'s ten- and eleven-year-old school friends. When K.A. was interviewed by the Children's Advocacy Center (CAC), she told the forensic interviewer that Robinson, her stepfather, cheated on her mother and that she was afraid of him, but she did not make an outcry.

A short time after the initial interview—on the same day—K.A. was interviewed a second time after having made an outcry to her parents. During the second CAC interview, K.A.

---

[1] TEX. PENAL CODE ANN. § 22.021(a)(2)(B).

[2] We identify the victim by initials to protect her privacy. *See* TEX. R. APP. P. 9.10(a).

[3] Although Robinson has not challenged the sufficiency of the evidence supporting his conviction, the nature of his appellate complaints requires a discussion of the evidence offered at trial.

stated that Robinson touched her vagina on one occasion with his hand.[4] K.A. told the interviewer that the incident happened in the summer at the apartment that Robinson shared with his brother. Following the second interview, the GCSD investigated the allegation of abuse.

Robinson denied the allegation in his interview with Craig Harrington, an investigator with the GCSD.[5] Robinson instead suggested that there might have been some inappropriate behavior by K.A.'s biological father.[6] During the course of his investigation, Harrington also obtained recorded interviews of K.A.'s maternal aunt and Adrian Lumpkins.[7] Both witnesses indicated that Robinson did not sexually abuse K.A.

K.A.'s aunt stated in her interview that she overheard K.A.'s grandmother tell K.A., "It's okay, baby girl, Mimi's going to take care of this because I don't like him either." K.A.'s aunt also talked to K.A. about the allegations, and K.A. indicated that "Mimi . . . told her if she started saying bad things about [Robinson] he would just go away." The aunt also claimed that Mimi was upset with Robinson because he had cheated on her daughter (K.A.'s mother) and that, if K.A.'s mother and Robinson reunited, Mimi would have to find a new place to live. The aunt believed that K.A. fabricated the abuse allegations.

---

[4]K.A. demonstrated how Robinson touched her by holding out her hand "with her fingers straight and mov[ing] her hand around in small circles." K.A. did not make claims of oral sex or any other type of inappropriate touching.

[5]Robinson voluntarily came in for the interview and understood that he could leave at any time.

[6]Although Harrington was made aware of allegations that K.A.'s biological father drank, dated multiple women around K.A., and would let her wear clothes "maybe deemed inappropriate," there was no evidence or allegations of sexual or physical abuse.

[7]Lumpkins was, at the time of the interview, Robinson's employer's wife. She and K.A.'s mother were long-term friends.

In her interview, Lumpkins stated that she did not believe the abuse allegations. She explained that she overheard K.A. state that, if her mother got back together with Robinson, they would have to move again. Harrington was not aware of any connection between K.A.'s aunt and Lumpkins.

K.A., who was seventeen at the time of trial, testified that her mother married Robinson before K.A. started kindergarten. K.A. recalled going to the CAC when she was in elementary school. She did not want to talk to the CAC interviewer, but she eventually told her a little bit of what happened. After the CAC interviews, she did not have to see Robinson very often.

K.A. explained that the first time Robinson touched her was the summer before first grade in a shed behind the family home.[8] K.A. had been playing in the sprinkler and was wearing a swimsuit. K.A. and Robinson were talking inside of the shed when he touched her vagina with his mouth after he had taken her swimsuit bottom off. Robinson then made K.A. put her hand on the Bible and swear that she would not let him "do those things to [her] anymore." K.A. testified that "this [went] on for . . . [m]ultiple years." K.A. stated that Robinson touched her again "[a]lmost every day" after that. At one point, Robinson inserted his fingers in K.A.'s vagina. K.A. testified that Robinson gave her marihuana multiple times in the shed as well.

The abuse eventually led to K.A. performing oral sex on Robinson multiple times beginning when K.A. was in the second or third grade. K.A. denied that Robinson ever put his penis in her vagina. When questioned further, however, K.A. admitted that Robinson forced her

_____

[8]K.A. clarified that the touching at the apartment was not the first incident of abuse. K.A. admitted that she was untruthful in the second CAC interview because she told the interviewer that the touching only happened once, when it had actually happened many times.

to have intercourse multiple times before she was ten years old. K.A. testified that the abuse ended when she was ten or eleven and in the fifth grade because Robinson no longer lived in the home.[9]

Around that same time, K.A. told her school friends about the abuse but asked them not to tell anyone about it. She also told her stepsister and one of her other friends about the abuse. After that, rumors began to circulate around school about the abuse. K.A. recalled getting a text message from a friend in 2017 asking who the abuser was and what she could do to stop it. K.A. responded to the text message denying the truth of the rumors because she wanted the rumors to stop.

In 2018, K.A. gave a third CAC interview after her mother discovered a notebook in her closet in which K.A. had written about the abuse.[10] K.A., who was thirteen at the time of the interview, contradicted information that she had given in the previous interviews. In the third interview, K.A. mentioned the abuse in the shed for the first time. She also disclosed that Robinson forced her to perform oral sex on him on multiple occasions and that he forced her to "ha[ve] sex."

According to K.A., she did not tell the interviewer about "every single time it happened" and admitted that she was untruthful in her first interview when she denied having been inappropriately touched by anyone. She was afraid of what would happen if she told the truth during that interview and explained that, as she progressed through the healing process, she was

---

[9]Despite this testimony, K.A. later testified that her mother let Robinson back into the house after the CAC interview and that the abuse continued a "few times."

[10]After the notebook was discovered, Robinson was arrested and charged with continuous sexual abuse of a child. The jury convicted him of the lesser-included offense of aggravated sexual assault of a child.

better able to disclose information about what happened to her. K.A. denied telling her aunt that she was going to make up a story about Robinson and testified that Mimi had never told her to accuse Robinson to get him out of the house. K.A.'s mother denied ever having encouraged K.A. to make allegations against Robinson. Robinson testified on his own behalf and adamantly denied the allegations of sexual abuse.

K.A. was diagnosed with depression, anxiety, attention deficit hyperactivity disorder, bipolar disorder, and post-traumatic stress disorder. K.A. used drugs and alcohol to escape the memories of what happened to her. She also attempted suicide; cut and scratched herself on her arms, legs, and stomach;[11] and was treated in multiple mental health hospitals and rehabilitation centers.

## II.    Standard of Review

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "We will uphold an evidentiary ruling if it

---

[11]K.A.'s medical records introduced at trial document K.A.'s claims of repeated sexual abuse by Robinson. Most of the medical assessments attributed K.A.'s mental health issues and drug use to Robinson's abuse.

was correct on any theory of law applicable to the case." *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

## III. Analysis

In his first two points of error, Robinson claims that the trial court erred in overruling his hearsay objections to the admission of K.A.'s letter and to the admission of an email K.A. sent to her church.

### A. K.A.'s Letter and Email

K.A. wrote a letter to Robinson, contained in the notebook that her mother found, as a way of coping with the abuse. After K.A. authenticated the notebook at trial, the State moved to introduce it into evidence. Robinson objected and questioned K.A. outside the presence of the jury. K.A. testified that, although she wrote the letter when she was in the eighth grade, the abuse ended approximately two years before she wrote the letter. The letter was private, and K.A. never intended for anyone to find it.[12]

After questioning K.A. outside the presence of the jury, Robinson objected to the letter's introduction into evidence on the basis of hearsay. Robinson argued that the State sought to introduce the letter merely to bolster K.A.'s testimony. The trial court overruled Robinson's objection and stated that it could be introduced under "803(3), (5) and possibly (6)."

When the jury returned to the courtroom, K.A. reiterated the testimony she had offered outside the jury's presence. She testified that she wrote what she was feeling to help lessen her anxiety and depression. The letter was published to the jury.

---

[12]K.A.'s mother found the notebook when it fell from a shelf in K.A.'s closet.

The letter described in detail the circumstances of Robinson's abuse. It described Robinson performing oral sex on K.A. when she was in kindergarten and stated that that conduct continued until the end of the fifth grade. The letter described one instance of K.A. performing oral sex on Robinson and one instance in which Robinson "made [K.A.] literally have sex with [him]." The letter stated that, when K.A. learned that was wrong, she was frightened and prayed every night that Robinson and her mother would divorce. The letter further described how K.A. saved Robinson when CPS got involved because she was too terrified to tell the truth. K.A. wrote, "I told them it was one time and all you did was touch me." K.A. stated that the abuse made her feel insecure and made sleeping difficult. The letter also stated that she experienced vivid recollections of what had happened. It ended by stating, "You are honestly a terrible person and I hope you rot in prison and burn in hell and later I will be writing a whole nother [sic] story about you forcing me to smoke weed."

Also outside of the jury's presence, the parties questioned K.A. about an email that she had written to her church on August 3, 2019, asking for the church's help through prayer. The email talked about Robinson's sexual abuse. K.A. believed the email would be anonymous. Robinson objected to the email's introduction into evidence because it was hearsay and there were no applicable exceptions. The trial court overruled Robinson's objection.

K.A. explained to the jury that she emailed her church and asked for prayers. The email read, in pertinent part:

> My name is [K.A.], and I'm 14. I have been through so much in my life. . . .
> Also, I was molested for five years straight by [Robinson] . . . . He would always
> get me high on weed and rape me and make me feel like it was my fault. He
> would make me put my hand on the Bible and promise I would stop making him

do those things to me. . . . [N]ow but it's only my word against his. I'm so scared he won't get put in jail and he'll kidnap me or kill me or something.

Robinson argues that the statements made in the letter and in the email are hearsay offered to prove the truth of the matter asserted. *See* TEX. R. EVID. 801(d). Robinson further asserts that there are no exceptions that would permit their introduction into evidence. Conversely, the State contends that those statements are not hearsay under Rule 801(e)(1)(B) of the Texas Rules of Evidence. *See* TEX. R. EVID. 801(e)(1)(B). We agree.

"Rule 801(e)(1)(B) gives substantive, non-hearsay status to prior consistent statements of a witness 'offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.'" *Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007) (quoting TEX. R. EVID. 801(e)(1)(B)). In addition, the admissibility of a prior consistent statement requires that (1) the "declarant testify at trial and be subject to cross-examination," (2) the prior statement be "consistent with the declarant's challenged in-court testimony," and (3) "the prior consistent statement . . . be made prior to the time that the supposed motive to falsify arose." *Id.* at 804.

"[T]here need be only a suggestion that the witness consciously altered [her] testimony in order to permit the use of earlier statements that are generally consistent with the testimony at trial." *Id.* at 804–05 (quoting *United States v. Casoni*, 950 F.2d 893, 904 (3d Cir. 1991)). As a result, "the trial court [has] substantial discretion to admit prior consistent statements under the rule." *Id.* at 805. "There is no bright line between a general challenge to memory or credibility and a suggestion of conscious fabrication, but the trial court should determine whether the cross-

9

examiner's questions or the tenor of that questioning would reasonably imply an intent by the witness to fabricate." *Id.*

"Courts may also consider clues from the voir dire, opening statements, and closing arguments." *Id.* at 808; *see also Klein v. State*, 273 S.W.3d 297, 315–17 (Tex. Crim. App. 2008) (considering entire record when determining whether trial court abused its discretion in admitting prior consistent statements). We, therefore, must determine, "[f]rom the totality of the questioning" and considering the entire record, "giving deference to the trial judge's assessment of tone, tenor, and demeanor," whether "a reasonable trial judge" could "conclude that the cross-examiner [was] mounting a charge of recent fabrication or improper motive." *Hammons*, 239 S.W.3d at 808–09.

The record reflects that defense counsel suggested throughout the trial that K.A. would fabricate her trial testimony and was, in fact, fabricating her trial testimony. During voir dire, defense counsel stated the following:

> Let's say, if a story changed, if I said "You know, I swam in the Olympics. But actually, you know, I raced a horse." Would that be an issue? What do we call people whose stories changed?
>
> . . . .
>
> And what do you do when you stand accused of the most heinous of crimes by a liar? That is why it's essential that you're able to hear and see the evidence that's actually presented.

During his opening statement, defense counsel said:

> There's no physical proof whatsoever that this happened. This case should scare everyone. It's based purely on what a mentally ill person -- an unwell person said. There's no DNA to corroborate her claims. There's no

10

physical evidence. There's no examinations. It all goes back to the things that this sick little girl said.

And just like we talked about during voir dire, what do we call folks that tell a story with different versions? Now, y'all didn't leave your common sense at the door. I urge you to keep it close. Because when she got initially interviewed she said that nothing had happened.

. . . . You're going to hear evidence about the fact that this story got cooked up, and there's a man sitting in this courtroom with his life on the line based on what a mentally ill person said.

. . . . But I suggest to you that this little girl is not a credible witness. And if you sit back and you look at what she's going to say and what every one [sic] else says, it's built on a house of cards based on stuff that came out of her mouth. And that's not enough.

Then, during cross-examination, defense counsel asked K.A. about matters she discussed in the CAC interviews that differed from her trial testimony as illustrated by the following excerpts:

> *Q.* Okay. But you'd agree with me that the version of events you gave that day [of the first interview] and the version of events you're giving today are different?
>
> *A.* Yes.
>
> . . . .
>
> *Q.* When you said that he had touched you, during [the second interview], did you say anything about him touching you with his mouth?
>
> *A.* No.
>
> *Q.* Did you say anything about him touching you with his penis?
>
> *A.* No.
>
> *Q.* Did you say anything about him forcing you to touch his penis?

11

*A.* No.

*Q.* Did you say anything about him touching you anywhere else other than your vagina?

*A.* No.

*Q.* And during -- that specific interview, did you say that he touched you while you were in a swimsuit?

*A.* No.

. . . .

*Q.* . . . . Before this cross-examination, have you said anything about any kind of event happening at an apartment?

*A.* No.

*Q.* In fact, your direct testimony was that this all happened at the house?

*A.* Yes.

. . . .

*Q.* So you're saying the third interview where you go over all this stuff, you had not told them everything that day either?

*A.* I told them what happened, but I didn't tell them every single time it happened.

*Q.* So would you agree that as we sit here today you're saying your statement is different today than it was in the third interview and the second interview and the first interview?

*A.* I mean, kind of.

*Q.* That -- would that be a fair statement?

*A.* Yeah.

12

. . . .

*Q.* Has anybody tried to influence what you're going to say today?

*A.* Just the truth.

*Q.* Okay. That's the same truth that you're asked to tell on every other occasion you've given evidence?

*A.* Yes.

. . . .

*Q.* And like -- and you're saying now there's some form of abuse that happened every day?

*A.* Yes.

*Q.* And would you agree with me that that's different than what you said on any of your other interviews?

Finally, defense counsel talked about K.A.'s lack of truthfulness during his closing

argument:

And during voir dire, we had extensive discussion about witness credibility. That goes to the heart of this whole case. Do I think that this little girl thinks this happened to her? Yes. Does that mean it actually did? No.

She testified to the fact that after her 2015 interview, she returned home and continued to be abused by [Robinson]. We heard verified testimony from both her mother and [Robinson] that he wasn't in the home anymore.

This is what I'm talking about on witness credibility. If it was physically impossible for that abuse to have occurred during that period of time, it couldn't have happened, despite what she said.

. . . .

During voir dire, there was some discussion of the one-witness rule where you could convict an individual of a crime based upon the evidence of one credible witness. But the key to that is that that witness has to be credible, has to

be believable. You have to understand what they're saying and agree with what they're saying.

[K.A.] is a very sick young lady. She's obviously suffered from some trauma in her life. And she's coming with these allegations that aren't substantiated. That's why we ask for substantiation, because if you're going to potentially find someone guilty of something that's going to take away one day, much less a decade, much less a lifetime away from them, you need to make sure it's corroborated.

. . . .

Now, why do I say that the testimony that she provided was unsubstantiated? Or not credible? She can't get her story straight.

. . . .

And the first interview, what did she say? She said that nothing happened. . . .

. . . .

. . . . And during the second interview, she ended up coming out and saying that she was touched.

. . . .

. . . . The common thread weaved through all of it is what [K.A.] said.

But the problem with this thread is that it keeps changing . . . .

. . . .

During the first interview, she said she was lying, because she was saying didn't anything happen, which is inconsistent with what she says now.

In the second interview she said she was lying. In fact, she said she was inconsistent on her third interview. Taken from what she testified to, the only thing y'all are supposed to believe is what is coming out of her mouth at that moment.

. . . . There's no proof that [Robinson] did this. There's no proof that [Robinson] did any of it. . . .

. . . . [I]f you find [Robinson] guilty, you're telling the community that all it takes is a little girl telling a story, and that's it.

Robinson claims that the letter and email were inadmissible as prior consistent statements for two reasons. First, he claims that this evidence was not offered or admitted pursuant to Rule 801(e)(1)(B). He, therefore, claims that this evidence cannot now be deemed admissible under Rule 801(e)(1)(B) because this issue was not litigated at trial. Yet, "it is well-settled [sic] that a trial court's decision will be sustained if it is correct on any theory of law applicable to the case, especially with regard to the admission of evidence." *McDuff v. State*, 939 S.W.2d 607, 619 (Tex. Crim. App. 1997) (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)); *see Flowers*, 438 S.W.3d at 107 (trial court's evidentiary ruling "will be upheld on appeal if it is correct on any theory of law that finds support in the record") (quoting *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006)). As a result, if the letter and email were properly admissible as prior consistent statements, it does not matter that the trial court did not admit them on that basis.

Robinson next claims that the letter and the email were not admissible as prior consistent statements "because there was no express or implied charge that K.A. had recently fabricated her allegation[s]." *See Moody v. State*, 827 S.W.2d 875, 894 (Tex. Crim. App. 1992). In support of this claim, Robinson argues that his defensive theory was that K.A. fabricated the allegations of abuse "from the very beginning in 2015." Because the letter was written in 2018 and the email

15

was written in 2019, Robinson contends that those statements were made after the motive to fabricate arose.

It is apparent from defense counsel's voir dire, opening statement, cross-examination, and closing argument that Robinson claimed K.A. fabricated the allegations of sexual abuse from the beginning. But Robinson's argument does not account for both express and implied charges that K.A. fabricated her trial testimony, as illustrated by the above-listed excerpts. These excerpts not only suggest that K.A.'s entire trial testimony was a product of fabrication, they also suggest that her testimony contained matters not previously alleged. The statements in K.A.'s letter and email were made before her allegedly fabricated trial testimony, including the matters not previously alleged. *See Dowthitt v. State*, 931 S.W.2d 244, 264 (Tex. Crim. App. 1996) (Rule 801(e)(1)(B) "requires merely that the witness' prior consistent statement be offered 'to rebut *an* express or implied charge against him of recent fabrication . . . .'" ); *Martinez v. State*, 276 S.W.3d 75, 82–83 (Tex. App.—San Antonio 2008, pet. ref'd) (finding that defendant opened door to admission of prior consistent statement when cross-examination elicited questions that left impression victim fabricated or provided different story to jury than she originally gave to CPS); *see White v. State*, 256 S.W.3d 380, 383–84 (Tex. App.—San Antonio 2008, pet. ref'd) (finding that cross-examination of complainant that highlighted "discrepancies between her testimony at trial and her statement to police," arising from her mentioning details at trial that she did not mention earlier, supported admission of prior consistent statement); *see also Gutierrez v. State*, 630 S.W.3d 270, 278, 282 (Tex. App.—Eastland 2020, pet. ref'd) (holding

16

prior consistent statement admissible in part because cross-examination suggested that "trial testimony contained matters that [child victim] had not previously alleged").

K.A. testified at trial and was subject to cross-examination regarding the letter and the email. Both the letter and the email were consistent with her trial testimony that Robinson had sexually assaulted her for a period of five years. It did rebut both the express and implied charge of recent fabrication based on the entirety of the record, including K.A.'s cross-examination. As a result, in reviewing the record in the light most favorable to the trial court's ruling, we conclude that the trial court acted within its discretion in admitting the letter and the email. *See* TEX. R. EVID. 801(e)(1)(B); *Dowthitt*, 931 S.W.2d at 264; *White*, 256 S.W.3d at 383–84.

### B.     Witness Testimony

The State questioned B.D.[13]—a friend of K.A.'s—outside the presence of the jury. In 2017, K.A. told B.D., who was a minor at the time, that she had been sexually abused by Robinson. K.A. struggled to tell B.D. what had happened and initially asked B.D. not to tell anyone about it. K.A. only told B.D. that Robinson had touched her in places that she did not need to be touched. B.D. understood that, if K.A.'s allegations were disclosed, K.A.'s mother would hate her. K.A. seemed to be uncomfortable talking about the abuse.

Robinson objected to the foregoing testimony on the basis that, because B.D. was a minor at the time of the disclosure, she was not a proper outcry witness and her testimony was hearsay. The trial court sustained Robinson's objection.[14] The following day after K.A. testified, the State

---

[13]We identify the witness by initials in order to protect her privacy. *See* TEX. R. APP. P. 9.10(a).

[14]*THE COURT*:  . . . . I'm going to sustain the objection at this point.

                      . . . .

17

called B.D. as a witness. When B.D. was asked if K.A. ever talked to her about a serious problem that she was having and if she recalled what the problem was, Robinson renewed his hearsay objection. The trial court overruled the objection without explanation.

B.D. testified that K.A. had told her about the abuse in 2017 or 2018. K.A. told B.D. that "she had been touched, and that things were happening to her that shouldn't be happening. And that . . . she had started doing drugs with [Robinson]." The touching that K.A. mentioned involved touching of her vagina and breasts. According to B.D.'s understanding, it happened "a lot." K.A. got very upset when she told B.D. about the abuse. Approximately one year after B.D. learned about the abuse, she gave an interview at the CAC. B.D. was sixteen at the time of the interview.

Robinson argues that the foregoing testimony constitutes inadmissible hearsay because it does not fall within an exception to the hearsay rule and because Rule 801(e)(1)(B) is not applicable to B.D.'s testimony as a prior consistent statement. Robinson argues that, because K.A. told B.D. about the abuse in 2017 and the defense's theory was that K.A. had fabricated the

---

If we get there later on, obviously there -- but at this point I'm not going to allow you to call [B.D.].

[The State]: Judge, can I ask -- because I'll cut this witness loose, and I don't want to waste anymore of her time.

*THE COURT*: I think, though, there's a possibility -- I mean, I know what you're saying is -- I think that at this point I'm not going to allow it. I think depending on her cross, of she's crossed, then it could possibly come in. . . .

[The State]: . . . . I'm very confident [K.A.'s] going to say, "Listen, I told my cousin and I told B.D. I was being abused back in 2017." [Defense counsel], I assume, would say, "Listen, you're a liar, you know, it didn't happen." And then at that point in time to corroborate that [K.A.] did tell this young lady this and that she did -- and it's the same thing as the journal.

18

allegations in 2015, K.A.'s statements to B.D. are not prior consistent statements. We reject this argument on the same basis as explained in the preceding portion of this opinion.

Robinson further contends that his cross-examination of K.A. did not challenge whether K.A. made accusatory statements to B.D. As a result, he claims that his cross-examination of K.A. did not open the door to B.D.'s testimony as a prior consistent statement. Yet, the trial court's admission of B.D.'s testimony was a proper exercise of its discretion under Rule 801(e)(1)(B) because, as explained above, K.A.'s cross-examination evidenced both express and implied allegations that K.A.'s entire trial testimony was a product of fabrication and that her testimony contained matters not previously alleged. We overrule this point of error. *See* TEX. R. EVID. 801(e)(1)(B); *Dowthitt*, 931 S.W.2d at 264; *White*, 256 S.W.3d at 383–84.

## IV.      Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:      January 3, 2023
Date Decided:        January 31, 2023

Do Not Publish

19